Filed 2/9/17 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re M.R. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E064621 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J261305, J261306 & J261307) |
| V. | ORDER MODIFYING OPINION |
| M.G. et al., | [NO CHANGE IN JUDGMENT] |
| Defendants and Appellants. | |

THE COURT:

The opinion filed in this matter on January 20, 2017, is modified as follows:

On page 17, in the first line of the first paragraph, delete "Roland" and replace with "R.R."

Except for this modification, the opinion remains unchanged. This modification does not effect a change in judgment.

1

CERTIFIED FOR PUBLICATION

HOLLENHORST

Acting P. J.

We concur:

MCKINSTER

J.

SLOUGH

J.

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re M.R. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E064621 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J261305, J261306 & J261307) |
| V. | OPINION |
| M.G. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County. Steven A. Mapes and Cheryl C. Kersey, Judges. Affirmed in part; reversed in part.

Matthew I. Thue, under appointment by the Court of Appeal, for Defendant and Appellant M.G.

Sharon S. Rollo, under appointment by the Court of Appeal, for Defendant and Appellant R.R.

Jean-Rene Basle, County Counsel, and Dawn M. Messer, Deputy County Counsel, for Plaintiff and Respondent.

Maryann M. Goode, under appointment by the Court of Appeal, for Minor Ro.R.

In July 2015, plaintiff and respondent San Bernardino County Children and Family Services (CFS) was contacted by the maternal grandmother of five children whose mother, defendant and appellant M.G. (mother), had "left the children with her" and then "took off." Issues relating to the three oldest of those children are raised by one or more parties in the present appeal; Ro.R., born in 2003; J.R., born in 2005; and M.R., born in 2006. The juvenile court declared J.R. and M.R. to be dependents of the court, placing them with the maternal grandmother, and ordering reunification services for mother, but not their father, defendant and appellant R.R. With respect to Ro.R., the juvenile court found two men—R.R., and defendant and respondent S.H.[1]—both to be presumed fathers of the child, pursuant to Family Code section 7612, subdivision (c). The juvenile court initially took jurisdiction over Ro.R., but subsequently dismissed his dependency petition, awarded sole legal and physical custody to S.H., and set the terms of visitation for mother and R.R. to remain in effect until modified by the family court.

Mother contends on appeal that the juvenile court erred by failing to comply with the notice requirements of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.), requiring reversal of its orders terminating jurisdiction over Ro.R. and its custody and visitation orders, and remand for compliance with ICWA. R.R. argues ICWA notice was deficient with respect to J.R. and M.R., as well as Ro.R. R.R. also asserts the

---

[1] As will be discussed in more detail below, S.H. appeared in the juvenile court proceedings, represented by counsel. An order of this court explicitly invited S.H. to file a respondent's brief in the present appeal, but he did not do so.

jurisdictional findings against him under Welfare and Institutions Code[2] section 300, subdivision (g) with respect to the three children were unsupported by substantial evidence. Additionally, R.R. challenges the trial court's finding that S.H. is a presumed father of Ro.R. and contests the custody and visitation orders issued by the juvenile court with respect to Ro.R. upon termination of its jurisdiction (sometimes called "exit orders")

We reverse the jurisdictional findings against R.R.; the trial court's exercise of jurisdiction over Ro.R., J.R. and M.R. on other bases, and all other orders appealed from, are affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

No party has disputed that R.R. is the biological father of J.R. and M.R., but both S.H. and R.R. claim to be the biological father of Ro.R. S.H. met mother when she was 16 years old and he was 18, and subsequently they dated for about two years—based on their birthdates, from about 1999 until 2001. Mother married R.R. in March 2003, after living with him for several years. Based on a normal gestation period and Ro.R.'s birthdate, mother was already living with R.R. when Ro.R. was conceived, in about December 2002.

---

[2] Further undesignated statutory references are to the Welfare and Institutions Code.

3

In 2006, while mother was pregnant with M.R., R.R. pleaded guilty to attempted murder, and was incarcerated for a term of 10 years.[3] In 2013, R.R. and mother's divorce became final.

In July 2015, the maternal grandmother of Ro.R., J.R., M.R., and their two younger half siblings (born in 2010 and 2011) contacted CFS, telling a social worker that mother had left all five children with her six weeks earlier, and "took off." Mother's whereabouts were unknown; mother's live-in boyfriend, A.R., the father of the two youngest children, was incarcerated.

On July 22, 2015, CFS detained the children, placing them with the maternal grandmother on an emergency basis. On July 24, 2015, CFS filed dependency petitions with respect to each of them. The petitions regarding Ro.R., J.R., and M.R. included allegations under section 300, subdivision (a) (serious physical harm), against mother, based on physical violence against the children by A.R.; subdivision (b) (failure to protect), against mother and R.R. with respect to all three children, and against S.H. with respect to Ro.R. only, based on, among other things, mother's substance abuse issues and abandonment of the children; subdivision (c) (serious emotional damage), based on domestic violence between mother and A.R.; and subdivision (g) (no provision for support), against mother and R.R. As relevant to the present appeal, the petition alleged under subdivision (g) that R.R.'s ability to parent "is unknown" and that he "is incarcerated and is unable to care and provide for" R.R., J.R., or M.R.

---

[3] R.R. was in custody throughout the proceedings in the juvenile court, with an expected parole date of April 2016. Our record does not reflect R.R.'s current status.

At the detention hearing on July 27, 2015, S.H. requested that Ro.R. be placed with him, asserting his belief that he was the boy's biological child, and claiming to have had a parental relationship with the child "since birth." S.H. explained, in response to questions from the court, that mother had told him that he was the father when she was first pregnant, and that she had called him again when the child was born. Mother subsequently told S.H. she had moved to Oregon, but would call him "whenever she came down" so that he could visit with the child. Ro.R. had been staying with S.H. from May 1 to July 22, 2015, when a social worker told S.H. that Ro.R. had to be taken back to the maternal grandmother's house. The court continued the detention hearing with respect to Ro.R., so that S.H. could be assessed for placement; it detained the other four children, placing them with the maternal grandmother.

In a statement of parentage filed on July 27, 2015, S.H. asserted that Ro.R. had spent a substantial amount of time with him, especially since Ro.R. was three years old.[4] Starting at age 3, Ro.R. had spent approximately 24 weekends per year with S.H.'s family. For the past five or six years, Ro.R. had spent entire spring and Christmas breaks with S.H. For the past three years, Ro.R. had spent his entire summer break with S.H.'s family; prior to that, he would spend half of summer breaks there. S.H. had presented Ro.R. as his own child to his wife and other two children, as well as his extended family. S.H. had participated in various activities with Ro.R., including "vacation, amusement parks, birthdays, beach, sports, school work [and] events."

---

[4] Ro.R. was approximately three years old when R.R. went into custody in 2006.

In a report filed July 29, 2015, CFS recommended Ro.R. be placed with S.H. During the assessment, S.H. told the social worker that he and his wife wished to care for Ro.R. "as their own and take full responsibility [for his] safety and well being." The social worker found their two-bedroom home, located in a "nice and quiet neighborhood in Riverside," to be "clean and well kept." S.H.'s wife reported that they have had a relationship with Ro.R. and have helped care for him since he was six months old, and that they "see [him] as part of their family." Ro.R. often stayed with them on weekends and holidays, and was always included in yearly family vacations. The social worker spoke to Ro.R., who confirmed that he wanted to live with S.H. and sees him as his father.

At the continued detention hearing, in response to inquiry by the court, mother asserted that R.R. is the biological father of Ro.R., and that she did not wish to "give rights away" to S.H. She acknowledged that S.H. and Ro.R. had a relationship, stating that "my son loves him to death," but contended that he "is just a very good friend and has been around the child, but he is not related in any way, shape, or form." The court detained Ro.R. and ordered that he be placed with S.H.

A contested jurisdictional/dispositional hearing was held on September 11, 2015. CFS had not interviewed R.R. in preparing its detention report or its jurisdiction/disposition report; several attempts by the social worker to contact him were unsuccessful. Nevertheless, the evidence considered at the hearing included R.R.'s statement of parentage, which he filed August 24, 2015. R.R. disputed S.H.'s claim to have been in Ro.R.'s life since birth, calling it "an outright lie." He asserted that he is the

6

father of M.R., J.R., and Ro.R., and claimed that even while incarcerated he could have arranged for the care of the children with members of his immediate family, if he had known there was "anything amiss." R.R. claimed that he had "solely supported" Ro.R. and J.R. from birth until he was incarcerated, and that since then he had helped "with clothing, school supplies, birthday gifts, food, as well as supervision [by his mother, the children's paternal grandmother] as needed, for all three (3) children."

R.R. was transported from prison to appear at the jurisdictional hearing. He testified that mother had told him he was Ro.R.'s father when she became pregnant; that he accompanied her to prenatal appointments, and was at the hospital when Ro.R. was born; and that he was listed as the father on Ro.R.'s birth certificate. R.R. had lived with Ro.R. from the child's birth until early 2006, when he was incarcerated. Since then, R.R. and the children had communicated primarily though mail and phone calls; Ro.R. had written to R.R. most recently about a year before, and visited him in prison once, in 2009.

At the jurisdictional hearing, S.H. testified that so far as he knew, he was Ro.R.'s biological father. During her pregnancy with Ro.R., mother told him that he "could possibly be [Ro.R.'s] father, but she wasn't certain." S.H. had held Ro.R. out as his son to his entire family, as well as to others outside of the family, such as teachers. S.H. never asked for a paternity test, and did not ask for one in these proceedings, "because, in my mind, he is my son." He testified that it "doesn't matter" whether Ro.R. is his biological child: "As far as I'm concerned, he has been in my life for 12 years. That's my son." According to S.H., Ro.R. refers to him as "Dad," and to his parents as "Grandma" and "Grandpa."

7

S.H. did not know mother had been married to or living with R.R. until after R.R. was incarcerated. During her pregnancy with Ro.R., and for the first three years of Ro.R.'s life, mother apparently lied to S.H. about her whereabouts, telling him that she had moved to live with her father in Oregon, when in fact she was living with R.R. in the San Bernardino area. When Ro.R. was born, S.H. was out of state for work,[5] but mother called him that morning to let him know about the birth. He met Ro.R. within the first month of his life. Over the next few years, S.H. would visit with Ro.R. from time to time: "Whenever she said she would come down and visit from Oregon, she would call me up and let me know she was around, and she would drop him off . . . ."

Neither S.H. nor mother ever sought the involvement of the courts to establish paternity or set the terms of child support. S.H. and mother got along, and S.H. "just told her whatever he needs to let me know." S.H. sent clothes, medicine, and money to Oregon for mother and Ro.R. until "she said that she finally moved back" while she was pregnant with M.R., which was in 2006. S.H. recalled that he threw a big party at his parents' house for Ro.R.'s third birthday, in 2006, "and pretty much after that [Ro.R.] was coming around a lot." S.H. tried to have Ro.R. over as much as he could; when S.H. had to work, his wife, whom he described as a "stay-at-home mother," would take care of him at their house. By 2006 or 2007, Ro.R. would regularly spend weekends, holidays, and school breaks in S.H.'s household.

---

[5] S.H. is a firefighter, currently working for the United States Department of Forestry; when Ro.R. was born, he was on a "fire assignment" in Montana.

As of April 2015, S.H. lost contact with mother for a period of about six months; she "was never around" when S.H. or his father would go to pick up Ro.R., and he could not reach her by telephone. Eventually, in late April 2015, S.H. "found out what was going on" in the household of mother and her live-in boyfriend; one of mother's relatives informed him about mother's drug usage and abandonment of the children. After that, S.H. testified, "when I got him I kept him." Except for a week-long period when CFS first became involved in the matter, Ro.R. has been living with S.H. full time since the end of April 2015.

In accord with the recommendations of CFS, the juvenile court struck all petition allegations asserted against S.H. It modified the allegations against the other parents, and sustained them as modified, finding among other things that J.R., M.R., and Ro.R. each fell within section 300, subdivisions (a), (b), and (g). As relevant to the present appeal, the juvenile court sustained subdivision (g) allegations with respect to R.R. as amended to allege only that he is incarcerated, and dismissed the other allegations asserted in the initial petitions with respect to him.

The juvenile court did not immediately rule with respect to disposition, instead setting a further hearing so that ICWA noticing could be completed. At the hearing on September 11, 2015, R.R. claimed possible "Apache" ancestry. CFS therefore sent notices to various Apache and Sioux tribes. At the continued hearing regarding disposition, on October 7, 2015, R.R. clarified that "[t]he tribe is actually two. It's

9

Navajo and it's Tewa, but they're from New Mexico.  My grandfather's—on my paternal side is an active member of the tribe and on the council."**6**

With respect to J.R. and M.R. (and their two younger half siblings), the juvenile court adopted the disposition findings and orders recommended by CFS, modified to reflect that they may come under the Indian Child Welfare Act, and that noticing pursuant to ICWA has been conducted.  The court found R.R. to be the noncustodial presumed father of J.R. and M.R.  The court declared J.R. and M.R. to be dependents of the court, placed them with their maternal grandmother, and ordered reunification services for mother, but not R.R.

The juvenile court followed CFS's recommendations with respect to Ro.R. as well.  It designated both S.H. and R.R. as noncustodial presumed fathers, applying Family Code section 7612, subdivision (c).  Citing Ro.R.'s best interests, it dismissed the dependency petition with respect to Ro.R. and terminated dependency jurisdiction, issuing a family law custody order granting sole physical and legal custody to S.H., and setting the terms of visitation for mother and R.R., to continue in effect until modified by

---

**6** On appeal, mother suggests father may have misspoken, intending to refer to the Kewa Pueblo Tribe of New Mexico.  That is a possibility.  Another possibility is that father meant exactly what he said, or that father's apparently shaky understanding of his heritage resulted in him mistaking the language spoken by his grandfather's tribe for the name of the tribe.  (See, e.g., *Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 51-52, 54 & fn. 5 [lawsuit involving Santa Clara Pueblo, a New Mexico tribe, which traditionally speaks the Tewa language]; *Tewa Tesuque v. Morton* (10th Cir. 1974) 498 F.2d 240, 242 [appeal from a lawsuit "brought by members of the Tewa Tesuque (Tewa) of the Pueblo of Tesuque (Pueblo), an Indian tribe"].)

the family court. With respect to R.R., the juvenile court ordered that he be permitted one hour of supervised visitation per month once he is released from custody.

## II. DISCUSSION

### A. Jurisdictional Findings with Respect to R.R.

R.R. has conceded that the juvenile court's exercise of jurisdiction over the children was proper, challenging only one of the juvenile court's several jurisdictional findings, specifically, its finding that Ro.R., M.R., and J.R. come within section 300, subdivision (g), because R.R. was incarcerated and unable to care and provide for them. The general rule is that "the juvenile court's exercise of jurisdiction over a child will be upheld if substantial evidence supports any one of the statutory bases for jurisdiction enumerated in the petition." (*In re M.M.* (2015) 236 Cal.App.4th 955, 964.) The juvenile court's various jurisdictional findings with respect to mother are not challenged in this appeal, and are independently sufficient to justify the juvenile court's exercise of jurisdiction over Ro.R., M.R., and J.R. (See, e.g., *In re Ashley B.* (2011) 202 Cal.App.4th 968, 979 ["[a]s long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate"].) Nevertheless, we exercise our discretion to reach the merits of R.R.'s arguments, because the challenged jurisdictional basis is the only one asserted against him, and the juvenile court's true findings could conceivably have consequences for him beyond jurisdiction. (*In re A.R.* (2014) 228 Cal.App.4th 1146, 1150.)

R.R. contends that no substantial evidence supports the trial court's jurisdictional findings with respect to him under section 300, subdivision (g). We agree.

11

"At the jurisdictional hearing, the court determines whether the minor falls within any of the categories specified in section 300. [Citation.] '"The petitioner in a dependency proceeding must prove by a preponderance of the evidence that the child . . . comes under the juvenile court's jurisdiction."' [Citation.] On appeal from an order making jurisdictional findings, we must uphold the court's findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings. [Citation.] Substantial evidence is evidence that is reasonable, credible, and of solid value. [Citation.]" (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185.)

A parent's incarceration may provide a basis for dependency jurisdiction under section 300, subdivision (g), but only if that parent "cannot arrange for the care of the child." (Welf. & Inst. Code, § 300, subd. (g).) "There is no 'Go to jail, lose your child' rule in California." (*In re S.D.* (2002) 99 Cal.App.4th 1068, 1077.) "[S]ection 300, subdivision (g) applies when, at the time of the [jurisdictional] hearing, a parent has been incarcerated and does not know how to make, or is physically or mentally incapable of making, preparations or plans for the care of his or her child." (*In re Aaron S.* (1991) 228 Cal.App.3d 202, 208.) Put another way, "neither incarceration alone nor the failure to make an appropriate advance plan for the child's ongoing care and supervision is sufficient to permit the exercise of jurisdiction under subdivision (g)." (*In re Andrew S.* (2016) 2 Cal.App.5th 536, 543.) Moreover, "[n]othing in section 300, subdivision (g) even requires an incarcerated parent . . . to prove affirmatively the suitability of [his or]

12

her caretaking arrangements. It requires only that [he or] she be able to make the arrangements." (*In re S.D., supra*, at p. 1079.)

There is no question that R.R. was incarcerated at the time of the jurisdictional hearing, as he had been since 2006. There is no substantial evidence in the record, however, to support the conclusion that he "does not know how to make, or is physically or mentally incapable of making, preparations or plans" for the care of his children.[7] (*In re Aaron S., supra*, 228 Cal.App.3d at p. 208.) CFS never interviewed R.R. to determine what sort of arrangements he could make for the children. The burden of proof was on CFS to show R.R. "*could not* arrange for [Ro.R.'s] care," and he "might have prevailed without making any factual showing at all." (*In re S.D., supra*, 99 Cal.App.4th at p. 1078.) Nevertheless, R.R. affirmatively asserted his ability to make arrangements for their care with "immediate family"—the record suggests that perhaps he had in mind his own mother, whom he indicated had previously provided some assistance in caring for the children, and who was in attendance at the dependency proceedings; or perhaps his former mother-in-law, the maternal grandmother with whom CFS initially placed the children, and with whom J.R. and M.R. and their younger half siblings continued to be placed after they were found to be dependents of the court. Moreover, although R.R. had not been able to physically care for the children since his incarceration, there was some evidence that he took an interest in them, and attempted to provide for them to some

---

[7] We note that neither CFS nor counsel for Ro.R. has contested R.R.'s arguments on appeal with respect to the juvenile court's jurisdictional findings under section 300, subd. (g).

13

degree from prison.  (Cf. *In re James C.* (2002) 104 Cal.App.4th 470, 484 [upholding jurisdiction under § 300, subd. (g), finding lack of evidence incarcerated father ever showed interest in or attempted to care for children sufficient to infer that he was unable or unwilling to arrange for care].)

Because CFS "presented no evidence that [R.R.] could not arrange care while he was incarcerated . . . it failed to satisfy its burden of proof to establish jurisdiction based on [his] incarceration and his inability to arrange for the children's care." (*In re Andrew S., supra*, 2 Cal.App.5th at p. 543.)  We will therefore reverse the trial court's true finding with respect to the exercise of jurisdiction under section 300, subdivision (g) based on R.R.'s incarceration and inability to arrange for the children's care, while affirming the juvenile court's exercise of jurisdiction over the children on other bases.

**B.  The Juvenile Court Did Not Err in Ruling S.H. to Be a Presumed Father of Ro.R.**

R.R. contends that the trial court erred in finding S.H. to be a presumed father.  He asserts, among other things, that the relationship between S.H. and Ro.R. "was that of a close family friend, not a father."  We disagree, and find no error; substantial evidence supports the juvenile court's conclusions that a parent-child relationship developed between S.H. and Ro.R., and that it would be detrimental to Ro.R. if only R.R. were to be recognized as his presumed father.

"Presumed father status is governed by [Family Code] section 7611, which sets out several rebuttable presumptions under which a man may qualify for this status, generally by marrying or attempting to marry the child's mother or by publicly

14

acknowledging paternity and receiving the child into his home. [Citations.] Biological fatherhood does not, in and of itself, qualify a man for presumed father status under section 7611. On the contrary, presumed father status is based on the familial relationship between the man and child, rather than any biological connection." (*In re J.L.* (2008) 159 Cal.App.4th 1010, 1018, superseded by statute on other grounds as stated in 4 Cal.App.5th 475, 486.) As relevant to the present case, Family Code section 7611, subdivision (d) applies where the parent "receives the child into his or her home and openly holds out the child as his or her natural child."

While the juvenile court may consider a wide range of factors in making a presumed parent determination, as appropriate to the circumstances (see, e.g., *In re T.R.* (2005) 132 Cal.App.4th 1202, 1211), the core issues are the person's established relationship with and demonstrated commitment to the child. (*Martinez v. Vaziri* (2016) 246 Cal.App.4th 373, 384-385.) In considering a challenge to a juvenile court's finding regarding presumed father status, we apply the substantial evidence test, drawing all reasonable inferences and resolving conflicts in the evidence in favor of the trial court's ruling, and refraining from any reweighing of the evidence. (*In re A.A.* (2003) 114 Cal.App.4th 771, 782.)

It used to be that a child could have only one presumed father, even if more than one individual might fulfill the statutory criteria. (*In re J.L., supra*, 159 Cal.App.4th at p. 1019.) In 2013, however, the Legislature amended Family Code section 7612 to permit the court to declare more than one presumed parent if it concludes "recognizing only two parents would be detrimental to the child." (Fam. Code, § 7612, subd. (c).) "In

15

determining detriment to the child, the court shall consider all relevant factors, including, but not limited to, the harm of removing the child from a stable placement with a parent who has fulfilled the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time." (Fam. Code, § 7612, subd. (c).) We review the juvenile court's finding of detriment within the meaning of Family Code section 7612, subdivision (c) for substantial evidence. (*In re Donovan L.,* (2016) 244 Cal.App.4th 1075, 1088.)

Substantial evidence supports the juvenile court's finding that S.H. meets the statutory criteria of a presumed father. S.H. testified that mother had told him that he could be the biological father of Ro.R., that he had always viewed Ro.R. as his son, and that he had always held him out as such to others. Although Ro.R. primarily lived with mother before April 2015, S.H. received him into his home and his family as often as he could. Particularly after R.R. was incarcerated in 2006, the visits grew more extended, eventually encompassing entire summer breaks, in addition to numerous weekends and other shorter visits. There was evidence Ro.R. had been cared for in S.H.'s household some of the time, and treated as part of the family not only by S.H., but also his wife and extended family, since he was six months old. Not only did S.H. view Ro.R. as his son, Ro.R. also viewed S.H. as his father. In short, substantial evidence in the record supports the conclusion S.H. had an established parent-child relationship with Ro.R., and a demonstrated commitment to him, so as to satisfy the requirements for being a presumed parent.

16

In arguing for the contrary conclusion, Roland asserts that the "chronology" of S.H.'s relationship with mother "verifies that S.H. could not be [Ro.R.'s] biological father."[8] As counsel for Ro.R. aptly puts it in a respondent's brief in this appeal, "such paternity arguments may be a little naïve . . . ." No doubt, the chronology establishes that mother was living with R.R. when Ro.R. was conceived, and that the two-year dating relationship between S.H. and mother was over by that time. Nevertheless, it is reasonable to infer that S.H. had some cause to believe mother when she told him while she was pregnant with Ro.R. that he could be the child's biological father. As has been noted in a related context, the "pattern of human relations" is sometimes "complicated." (*In re J.L., supra*, 159 Cal.App.4th at p. 1019.)

Moreover, presumed parent status is based on the "familial relationship between the man and child, rather than any biological connection." (*In re J.L., supra*, 159 Cal.App.4th at p. 1018.) In this case, no paternity testing has been performed to determine whether S.H., R.R. or some other man is the biological father of Ro.R. But even if paternity testing were to exclude the possibility that S.H. is Ro.R.'s biological father, it would not negate the substantial evidence of S.H.'s demonstrated commitment to Ro.R. and the established relationship between them, on which the juvenile court properly based its determination that S.H. should be deemed a presumed parent of Ro.R. (*Martinez v. Vaziri, supra*, 246 Cal.App.4th at pp. 384-385.)

---

[8] Mother advances the same flawed chronological reasoning in her own briefing on appeal.

17

R.R. suggests that the circumstance that Ro.R. did not live with S.H. and his family full time until relatively recently means that Family Code section 7611, subdivision (d) could not apply. Not so. It is not the living arrangements, but the relationship between the child and the adult that is the primary factor in determining whether the adult should be deemed a presumed parent. For example, in *R.M. v. T.A.* (2015) 233 Cal.App.4th 760, the Court of Appeal affirmed a presumed parent finding in favor of a non-custodial biological father who lived out of state, but who had received the child into his home "on a regular basis to provide her paternal love and care," and who had held the child out as his daughter. (*Id.* at p. 781.) Similarly, here, the relationship between S.H. and Ro.R. was developed primarily through visits, rather than Ro.R. living with S.H. full time, but there is abundant evidence that S.H. had received Ro.R. into his home on a regular basis for years (increasingly often, and for longer periods of time) to provide him with paternal love and care, and that he held him out as his son in all respects. That is sufficient to satisfy the statutory requirements of Family Code section 7611, subdivision (d).

R.R. further argues that he is entitled to a conclusive marital presumption that he is R.R's parent under Family Code section 7540, and that this "defeat[s]" S.H.'s claim to be a presumed parent under Family Code section 7611, subdivision (d). This argument fails in two respects; Family Code section 7540 does not apply to the facts of the present case, and even if it did, it would not defeat S.H.'s claim to be a presumed parent of the child.

First, Family Code section 7540 provides that, subject to an exception not applicable here, "the child of a wife cohabitating with her husband, who is not impotent

or sterile, is conclusively presumed to be a child of the marriage." (Fam. Code, § 7540.) This statute applies, however, when the child was not only born during an existing marriage, but also conceived during the marriage. (*Michael M. v. Giovanna F.* (1992) 5 Cal.App.4th 1272, 1281-1282) R.R. and mother married in March 2003, several months after Ro.R. was conceived. R.R. therefore is not entitled to the conclusive presumption of parentage provided by Family Code section 7540.

Second, the circumstance that R.R. is a presumed parent of Ro.R.—whether under Family Code section 7540, as he proposes, or under Family Code section 7611, subdivisions (a) and (d), which is more likely the correct analysis—does not render the court's decision to deem S.H. a presumed parent erroneous. As noted, since 2013, California law has permitted the court to declare more than one presumed father if it concludes "recognizing only two parents would be detrimental to the child." (Fam. Code, § 7612, subd. (c).) Under current law, R.R.'s status as a presumed father of Ro.R.— which has not been challenged by any party to this appeal—does not "defeat" S.H.'s claim to be a presumed parent of Ro.R. any more than S.H.'s status defeats R.R.'s; they are simply both presumed parents of the child.

*In re Donovan L., supra*, 244 Cal.App.4th 1075, relied on by R.R., does not require a different result. In that case, the court of appeal ruled that the juvenile court erred by applying Family Code section 7612, subdivision (c) in an attempt to promote a parent-child relationship between a third putative parent—the biological father—and a child, where the relationship did not yet exist. (*In re Donovan L., supra*, at pp. 1092-1094.) Looking to legislative history and statutory language, the court of appeal found

19

that the statute was intended to preserve "an existing, rather than potential, relationship between a putative third parent and the child." (*Id.* at p. 1092.) Because the trial court determined there was no existing parent-child relationship with the child, no substantial evidence supported a finding of detriment under Family Code section 7612, subdivision (c). (*In re Donovan L.*, *supra*, at pp. 1092-1094)

The existing, well-established relationship between S.H. and Ro.R. is fundamentally different from the potential relationship at issue in *In re Donovan L.* For the reasons discussed above, the juvenile court's ruling here falls squarely within the purposes of the statute, including to preserve "a stable placement with a parent who has fulfilled the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time." (Fam. Code, § 7612, subd. (c).) The juvenile court's ruling does not require a finding of unfitness of R.R. or mother. (*Ibid.*) Nevertheless, its ruling regarding Ro.R.'s best interests is also supported by the circumstance that S.H. can provide Ro.R., as R.R. puts it in his briefing, "a more ordered life" than mother or R.R. have been able to provide.

There is an ample support in the record for the juvenile court's conclusion that to recognize only R.R. and mother as Ro.R.'s parents would be detrimental to R.R, and its decision to designate both R.R. and S.H. as presumed fathers on that basis. We will not disturb the trial court's ruling.

20

**C. R.R. Fails to Demonstrate Any Abuse of Discretion Regarding the Juvenile Court's Custody or Visitation Orders**

R.R. objects to the juvenile court's orders, upon termination of its dependency jurisdiction over Ro.R., awarding S.H. full legal and physical custody, and allowing R.R. one hour of supervised visitation per month, beginning once he is released from custody. We find no abuse of discretion in the trial court's orders.

"We normally review the juvenile court's decision to terminate dependency jurisdiction and to issue a custody (or 'exit') order pursuant to section 362.4 for abuse of discretion [citation] and may not disturb the order unless the court ""exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].""" (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.)

There is nothing arbitrary, capricious, or patently absurd in the trial court's determination that S.H. should have full legal and physical custody of Ro.R. Mother suffers from drug addiction; had abandoned the children with the maternal grandmother and just "took off"; had engaged in domestic violence with her live-in boyfriend; and had failed to protect the children from physical violence at the hands of her live-in boyfriend. R.R. was in prison serving a 10-year sentence for attempted murder, had last been a full-time parent of Ro.R. in 2006, and had only minimal contact with Ro.R. since then. In contrast, the record strongly supports the conclusion that S.H. has accepted Ro.R. as his son, and regularly provided paternal love and care since the child was an infant, even though Ro.R. only came to live with him full time relatively recently, and even though they may or may not share a biological connection. As the juvenile court found, S.H. is

21

ready and willing to provide "stability and unconditional love in a home" for Ro.R. The trial court's conclusion that it would be in Ro.R.'s best interests for S.H. to have full legal and physical custody was hardly a stretch, let alone beyond the bounds of reason.

R.R.'s arguments in support of the contrary conclusion rest in part on the premise that "[S.H.] is neither [Ro.R.'s] biological nor his presumed father." This premise is not supported by the record. S.H. has not been excluded as the possible biological father of Ro.R., but even if he had been, that circumstance would have no bearing on the propriety of the juvenile court's custody and visitation orders. And, for the reasons discussed above, S.H. was properly designated as a presumed father of Ro.R.

R.R. asserts that the trial court's erroneous jurisdictional findings with respect to him, which we discussed above, are "partly responsible" for the trial court's decisions regarding custody and visitation of Ro.R. They are not. There is nothing in the record to suggest that, in making its custody and visitation orders, the juvenile court gave any particular weight to the technicality of whether or not Ro.R. fell within section 300, subdivision (g). The record does suggest that the court (properly) gave weight to, among other things, the undisputed fact that R.R. had been incarcerated for many years, and had only a limited relationship with Ro.R. as a result. We find no reasonable doubt that if we were to remand the matter for reconsideration of the custody and visitation orders in light of our ruling on its jurisdictional findings, the juvenile court would reach the same conclusions it did the first time around.

R.R. notes that the juvenile court's orders do not "account for sibling visitation." There is no requirement, however, for the juvenile court to include such matters in its exit

22

orders, even though of course it has the authority to do so, if it deems it necessary. (See § 16002, subd (a)(2) [juvenile court "has the authority to develop a visitation plan"].) There is no indication in the record that S.H. and the maternal grandmother who has custody of Ro.R.'s siblings are not willing or able to arrange visitation between the siblings without court intervention, and no party asked the juvenile court to include specific orders on the issue. R.R.'s observation that the exit orders do not explicitly provide for sibling visitation does not demonstrate any error.

R.R. also complains about the substantial showing of changed circumstances he will have to make in order to convince the family court to modify the custody and visitation orders put in place by the juvenile court. (E.g., *In re Michael W.* (1997) 54 Cal.App.4th 190, 196.) Nothing about the burden of obtaining modifications to the juvenile court's orders from the family court, however, demonstrates that the orders are themselves erroneous.

Because R.R. fails to demonstrate that the juvenile court's exit orders are arbitrary, capricious, or patently absurd, they will be affirmed.

## D. Mother and R.R. Fail to Demonstrate Any Reversible Error Based on ICWA Compliance.

Both mother and R.R. challenge the adequacy of the efforts made to comply with the notice requirements of ICWA; mother raises this issue only with respect to Ro.R., while R.R. raises it with respect to Ro.R., J.R., and M.R. Neither mother or R.R., however, demonstrate any reversible error.

23

ICWA notice is required to be sent whenever it is known or there is reason to know that an Indian child is involved in a "child custody proceeding" within the meaning of ICWA, which includes a proceeding for temporary or long-term foster care or guardianship placement, termination of parental rights, pre-adoptive placement after termination of parental rights, or adoptive placement. (§§ 224.1, subd. (d), 224.2, subd. (a); 25 U.S.C. §§ 1903(1), 1912(a).) In such cases, notice must be sent to all federally recognized tribes of which the child may be a member or eligible for membership. (Cal. Rules of Court, rule 5.481(b)(1).) However, "[b]y its own terms, [ICWA] requires notice only when child welfare authorities seek permanent foster care or termination of parental rights; it does not require notice *anytime* a child of possible or actual Native American descent is involved in a dependency proceeding." (*In re Alexis H.* (2005) 132 Cal.App.4th 11, 14; see also *In re J.B.* (2009) 178 Cal.App.4th 751, 758 [finding that "ICWA does not apply to a proceeding to place an Indian child with a *parent*"].)

Juvenile courts and child protective agencies have "'an affirmative and continuing duty to inquire whether a [dependent] child . . . is or may be an Indian child.'" (*In re H.B.* (2008) 161 Cal.App.4th 115, 121; § 224.3; see Cal. Rules of Court, rule 5.481.) "The juvenile court must determine whether proper notice was given under ICWA and whether ICWA applies to the proceedings." (*In re E.W.* (2009) 170 Cal.App.4th 396, 403.)

At the dispositional hearing on October 7, 2015, the juvenile court found that noticing under ICWA had been initiated, and that ICWA *may* apply as to M.R. and J.R. It made no final ruling as to whether proper notice has been completed, and whether

24

ICWA applies to the proceedings with respect to those two children. R.R.'s claim of error regarding ICWA compliance with respect to M.R. and J.R. is therefore simply premature. We decline R.R.'s invitation to assess the adequacy of an ICWA noticing process that is, as best we can determine from the record in this appeal, still ongoing.[9]

Although CFS initially detained Ro.R. with his maternal grandmother, it very shortly thereafter sought to place Ro.R. with S.H., and never sought long-term foster care placement or termination of mother or R.R.'s parental rights. (See *In re Alexis H., supra,* 132 Cal.App.4th at p. 14.) ICWA and its attendant notice requirements do not apply to a proceeding in which a dependent child is removed from one parent and placed with another. (*In re Alexis H., supra*, at p. 14; see *In re J.B., supra*, 178 Cal.App.4th at p. 758.) As such, there can be no ICWA related error with respect to the juvenile court's orders regarding Ro.R.; his placement with S.H. is a placement with a parent.

Mother argues that the California case law finding ICWA not to apply to proceedings in which a child is removed from one parent and placed with another is wrongly decided, because it conflicts with ICWA's "fundamental goal of promoting the stability and security of Indian tribes and families." *In re J.B.* discusses the legislative intent of ICWA and comes to a different conclusion: "Congress declared its policy 'to protect the best interests of Indian children and to promote the stability and security of

---

[9] Of course, during the pendency of this appeal, the juvenile court proceedings with respect to J.R., M.R., and their two younger half siblings have been ongoing. We may address any claims of error that arise from those parallel proceedings, including the juvenile court's final rulings with respect to ICWA matters, in a subsequent appeal, if and when any is brought.

Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children *from their families* and the placement of such children *in foster or adoptive homes* which will reflect the unique values of Indian culture . . . .'" (*In re J.B., supra*, 178 Cal.App.4th at p. 760 [quoting 25 U.S.C. § 1902, italics added].) Placing a child with a parent—even a previously non-custodial parent—does not equate with removal of the child from its family, and placement in a foster or adoptive home.

Mother also suggests that Ro.R.'s placement with S.H. is reasonably viewed as "an 'action removing an Indian child from its parent . . . for temporary placement in . . . the home of a guardian . . . where the parent . . . cannot have the child returned upon demand'" in the meaning of section 224.1, subdivision (d), thereby triggering ICWA requirements. Not so. Ro.R.'s placement with S.H. is a permanent (albeit subject to modification by the family court) award of legal and physical custody in favor of a *parent*, not a temporary placement with a guardian. (Cf. § 360 [regarding legal guardianship.)

Mother and R.R. both make arguments that depend on the propositions that S.H. is not Ro.R.'s biological father, and that R.R. is. As previously noted, the present record does not definitively establish either of those propositions to be true. We therefore will leave detailed discussion of whether ICWA applies where a child is removed from the custody of both of his biological parents, and placed in the custody of a third parent who is not a biological parent, for a case that presents those facts. For present purposes, it suffices to briefly note that we are not persuaded that the rule articulated in *In re J.B.* and

similar cases should be limited to circumstances where it has been definitively established that the parent to whom custody is awarded is a biological parent.

### III.  DISPOSITION

The trial court's jurisdictional findings that Ro.R., J.R., and M.R. came within section 300, subdivision (g) based on R.R.'s incarceration, are reversed; the trial court's exercise of jurisdiction over Ro.R., J.R., and M.R. on other bases, and all other orders appealed from, are affirmed.

CERTIFIED FOR PUBLICATION

HOLLENHORST

Acting P. J.

We concur:

MCKINSTER

J.

SLOUGH

J.

27