Filed 2/22/23  In re A.B. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re A.B., a Person Coming Under the Juvenile Court Law. | D080841 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. EJ4676) |
| Plaintiff and Respondent, | |
| v. | |
| M.B., | |
| Defendant and Appellant; | |
| D.T., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant, M.B.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Respondent, D.T.

Claudia G. Silva, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Tahra Broderson, Deputy County Counsel, for Plaintiff and Respondent.

Defendant and appellant M.B. (Mother) appeals from the final judgment and order terminating jurisdiction in a Welfare and Institutions Code[1] section 300 dependency proceeding regarding her son, A.B. The juvenile court granted full legal and physical custody to defendant and respondent D.T. (Father) and ordered Mother to have a minimum of one supervised visit per week. On appeal, Mother takes issue with the court denying her joint legal custody over A.B. We conclude the court was within its discretion to grant sole legal custody to Father under the totality of the circumstances. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In August 2021, the San Diego County Health and Human Services Agency (Agency) filed a section 300, subdivision (b) petition on behalf of A.B., who was six months old at the time. The Agency alleged that A.B. suffered or there was a substantial risk that A.B. would suffer serious physical harm or illness as a result of Mother's failure to adequately supervise or protect A.B. The petition was based on the factual allegation that A.B. was discovered with a tongue laceration that would not ordinarily be sustained except as the result of unreasonable or neglectful acts or omissions.

Mother informed the Agency that her boyfriend noticed A.B. had blood in his mouth one afternoon, and Mother decided to take A.B. to the hospital.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

Mother did not know what caused A.B.'s cut under his tongue. The Agency spoke to Mother's boyfriend, who stated he was in a car with A.B. waiting for Mother to pick up food. He was sitting in the front seat and A.B. was behind him when A.B. started crying. Mother's boyfriend reached behind him and tried to give A.B. a pacifier without looking. According to Mother's boyfriend, when he put the pacifier in A.B.'s mouth the hard plastic edge also went into A.B.'s mouth. When he pulled the pacifier out, there was blood on it. Two doctors indicated that the injury was evidence of or raised concern for inflicted injury. The Agency explained this to Mother and she understood that A.B. would need to be placed on a safety plan out of the home.

In its August 19, 2021 detention report, the Agency reported that A.B. was currently safety planned with maternal step-great-grandmother. Father was identified as the alleged father, and while he did not know if he was A.B.'s father, he was willing to participate in the case if a test showed that he was A.B.'s father. The Agency reported that Mother had not demonstrated an understanding of the severity of the safety concerns with A.B. and recommended that A.B. remain in out-of-home care. The court ordered A.B. detained and ordered a paternity test at Father's request.

In its September 13, 2021 jurisdiction and disposition report, the Agency reported that A.B. was detained in an approved foster home. Mother was also in the extended foster care program herself. The Agency received an email from Mother's extended foster care worker, stating there was a concern that Mother may be in a domestic violence relationship that was impacting Mother's housing. On September 2, 2021, Mother's apartment was found with a damaged faucet, which caused a water leak in the apartment below, and it appeared there had been a struggle or fight. As a result of the incident, the apartment manager asked the housing program to not allow

3

Mother to return to the apartment. The Agency expressed concern that Mother would continue to have A.B. in unsafe situations and around unsafe people. While it appeared that Mother cared for and loved A.B., there was concern about Mother's decisionmaking and ability to keep A.B. safe.

In its October 19, 2021 addendum report, the Agency reported that the paternity test indicated Father was A.B.'s father. Father requested placement of A.B. but did not have stable housing. In its November 1, 2021 addendum report, the Agency reported that Father purchased a crib and car seat, was ready to begin parenting classes, had supervised in-person visits with A.B., and was planning to move into paternal aunt's home in order to take placement of A.B. The Agency continued to have safety and risk concerns with Mother. The Agency requested discretion to detain A.B. with Father on the conditions that he reside in the home of paternal aunt and that he not supervise Mother's visits. At the pretrial conference, the Agency informed the court that paternal aunt was cleared for unsupervised contact and to supervise Father. The court granted the Agency discretion to detain A.B. with Father on the condition that he move in with paternal aunt and continue to reside with her.

In its December 7, 2021 addendum report, the Agency reported that Father moved into paternal aunt's home and A.B. was detained with Father on November 18, 2021. The Agency also reported that Mother had been having consistent visits with A.B. for almost two months and was participating in parenting classes. However, the Agency noted that Mother was uncommunicative with the Agency and did not have in-person visits with A.B. for nearly half the case and was in the beginning stages of making behavioral changes. The Agency indicated Mother needed to show consistency in her services and visits. The Agency recommended that A.B. be

4

placed with Father and that Mother have supervised visitation. The contested jurisdiction and disposition hearing occurred on December 13, 2021, at which time the court sustained the petition, removed A.B. from Mother's custody, and placed A.B. with Father.

In its June 8, 2022 six-month family maintenance review report, the Agency recommended that Father be granted custody of A.B., Mother's visits remain supervised, and jurisdiction be terminated.

The Agency reported that Mother was still working on her case plan objectives, which were to develop positive support systems with friends and family, comply with medical or psychological treatment, and pay attention to and monitor A.B.'s health, safety, and well-being. In order to assist Mother in meeting her objectives, the services the Agency was to provide were a psychological evaluation, counseling, and parenting education.

The only service that Mother completed was the psychological evaluation, which indicated concerns with Mother's understanding of the day-to-day practical needs of A.B., and "the stress, occasional sense of disappointment and frustration, perceived failure, concerns over isolation, and difficulty recognizing the need for and seeking assistance." The psychologist's report recommended therapy and a parenting course.

The Agency reported that Mother was not currently participating in her counseling service. On February 23, 2022, the Agency offered Mother a therapy referral, which Mother declined. Three months later, on May 23, 2022, Mother asked the Agency for a therapy referral to Home Start Inc. On May 31, 2022, the Agency learned that Home Start Inc. did not have ability to service adults at that time, informed Mother of the same, and recommended other resources for Mother to contact for therapy.

The Agency reported that Mother was currently participating in parenting education services. Specifically, she was participating in in-home parenting education with Home Start Inc. from November 2021 to February 2022, however, she was discharged in April 2022 due to failure to respond to the provider. From December 3, 2021 to January 27, 2022, Mother completed weekly parenting sessions and completed the health module of the curriculum. She began but did not complete the home safety module due to not having stable housing. Mother was scheduled to begin the parent interaction module in February 2022, however, from February 2022 to April 2022, Mother met with the provider only twice (once to complete paperwork and once to complete one session of the parent interaction module). All the missed classes were either canceled by Mother or she was a no-show. Mother re-registered for parenting classes with Home Start Inc. on May 23, 2022. Mother also registered for a three-week on-line parenting class through Child Parent Institute, which was scheduled to begin on June 2, 2022.

The Agency also reported that Mother's visitation with A.B. was sporadic. From December 14, 2021 to March 1, 2022, Mother had 16 visits scheduled and eight were canceled by Mother. On February 7, 2022, the visit coach did not think it would be safe for Mother to have unsupervised visits, and indicated that Mother still needed one-to-two reminders per visit to keep an eye on A.B. to ensure his safety. From February 2022 to June 8, 2022, Mother was inconsistent with her visits and canceled or did not show for the majority of the scheduled visits. She attended only one visit in February, one visit in March, no visits in April, and one visit in May.

The Agency reported that Mother moved out of her sister's home in late January or early February 2022 and was "couch surfing" until May 2022 when she returned to her sister's home. Mother was employed but had not

6

been working because she wanted to re-establish herself in services and visits with A.B.

The Agency reported that Father had been caring for A.B. since November 18, 2021, and that A.B. was doing well in Father's care. The Agency reported that Father had maintained housing and employment and had balanced his work schedule while caring for A.B. with the support of paternal grandmother, paternal aunt, and Father's girlfriend. Father was observed to be appropriate and protective of A.B. and had adequate supplies. He had also been consistently participating in in-home parenting education since January 4, 2022.

The contested six-month review hearing occurred on June 30, 2022. Mother's counsel asked the court to consider keeping the case open because Mother wanted to participate in services. If the court was not inclined to do so, Mother requested unsupervised visits and joint legal custody of A.B. With respect to the case plan, Mother's counsel argued that Mother completed her psychological evaluation and "as recently as May 31st, she was attempting to get into therapy." Counsel also pointed out that Mother "registered for the home start parenting and also registered for a three-week on-line class." Mother's counsel argued that Mother had been making herself available and that "the presumption in California is for joint legal custody when the parents are both appropriate and able to make decisions."

Father objected to joint legal custody, arguing that Mother had not demonstrated that she is responsible enough to have any type of custody. The Agency and counsel for A.B. submitted the issue of joint legal custody to the court. A.B.'s counsel noted that Mother has been visiting, although sporadically, and stated "typically in those situations, it is appropriate to give that type of parent legal custody, but I would submit the issue to the court."

7

The court found that the conditions that justified the court's jurisdiction no longer existed. The court also found that Mother's progress toward alleviating the causes necessitating placement had been minimal, and Father's progress had been adequate. The court terminated jurisdiction, granted Father sole legal and physical custody of A.B., and ordered Mother to have at least one supervised visit per week. In issuing its ruling, the court stated "looking at the totality of evidence, I do believe it is appropriate at this time to grant sole legal and physical custody to the father. . . . I appreciate the fact that the mother is at the last minute here seems like [she is] getting involved in services but because of inconsistency and inavailability [*sic*], I do believe that sole physical and legal [custody] at this point is supported by the facts."

## DISCUSSION

Mother argues the juvenile court abused its discretion in awarding Father sole legal custody of A.B. and contends the court's decision was not supported by substantial evidence. She argues she was prejudiced by the court's custody order because she will now have a higher burden of changing the custody order to obtain joint legal custody in family court. The Agency filed a letter brief declining to take a position on the issue. Father argues the court was within its discretion to grant him sole legal custody.

### A. Applicable Law

When the juvenile court terminates dependency jurisdiction, it may issue a custody and visitation order. (§ 362.4.) Under section 362.4, the court has broad discretion to fashion custody and visitation orders, considering the totality of the child's circumstances and the best interests of the child. (*In re Chantal S.* (1996) 13 Cal.4th 196, 206 (*Chantal S.*); *In re John W.* (1996) 41 Cal.App.4th 961, 973 (*John W.*).) A juvenile court custody and visitation

8

order, commonly referred to as an "exit order," is enforceable in family court. (*John W.*, *supra*, at p. 970; *Chantal S.*, *supra*, at p. 213.)

When making a custody determination, the juvenile court's focus and primary consideration is the best interests of the child. (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268 (*Nicholas H.*).) The juvenile court is not bound by any family court preferences or presumptions, such as a presumption of parental fitness. (*Ibid.*, citing *Chantal S., supra*, 13 Cal.4th at p. 206.)

"The standard of appellate review of custody and visitation orders is the deferential abuse of discretion test. [Citation.] The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child." (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32; *In re Maya L.* (2014) 232 Cal.App.4th 81, 102 ["We review a juvenile court's custody orders for abuse of discretion."].) " 'When applying the deferential abuse of discretion standard, "the trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." [Citations.]' [Citation.]" (*In re Maya L.*, *supra*, at p. 102.)

We "may not disturb the order unless the court ' " 'exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].' " ' " (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300; accord *In re M.R.* (2017) 7 Cal.App.5th 886, 902.) We will find an abuse of discretion by a trial court only when we conclude that under all the circumstances, viewed most favorably in support of the decision, no judge reasonably could have made that decision. (*Estate of Sapp* (2019) 36 Cal.App.5th 86, 104.)

## B. Analysis

Mother argues the evidence did not support the juvenile court's decision to grant sole legal custody to Father. She contends that by the time of the six-month review hearing, she had made herself available, was visiting with A.B., and was suitable to share in the responsibility of making legal decisions on behalf of A.B. We disagree and conclude the court acted within its discretion under the totality of the circumstances.

The timeline of this case and Mother's status in terms of her case plan objectives and services at the time of the review hearing is particularly informative. A.B. was six months old when the Agency filed its petition on August 9, 2021. Father was noncustodial at the time and was not sure if he was A.B.'s father. A.B. was detained in a foster home then placed with Father on November 18, 2021, after his paternity was confirmed. The contested jurisdiction and disposition hearing occurred on December 13, 2021, and the contested six-month review hearing occurred on June 30, 2022. By the time of the Agency's six-month status review report, Mother was still working on and had not met any of her case plan objectives. She had not also made progress on her services.

The only service that Mother completed was a psychological evaluation, the results of which recommended therapy and a parenting course. Mother initially rejected the Agency's offer for a therapy referral to begin her counseling service on February 23, 2022, and she did not request a therapy referral until three months later on May 23, 2022, just one month before the review hearing. At the hearing on June 30, 2022, Mother's counsel stated that "as recently as May 31st, she was attempting to get into therapy." Mother's counsel did not present evidence that Mother had begun therapy. As such, as of one month before the review hearing, Mother had not even

10

begun any therapy, and there is no indication that she had done so by the time of the hearing.

Mother had also not completed her parenting education service. She was participating in weekly classes with Home Start Inc. from December 3, 2021 to January 27, 2022, but met with the provider only twice from February 2022 to April 2022, at which time she was discharged due to failure to respond to the provider. Before being discharged, Mother had completed the health module of the curriculum, began but did not complete the home safety module, and attended one session of the parent interaction module. Mother re-registered for parenting classes with Home Start Inc. on May 23, 2022—again, one month before the review hearing—and was scheduled to begin a three-week on-line parenting class through Child Parent Institute on June 2, 2022. At the June 30, 2022 hearing, Mother's counsel stated that Mother "registered for the home start parenting and also registered for a three-week on-line class." Mother's counsel did not present evidence that Mother had completed the online class or any additional module of the Home Start Inc. curriculum.

Mother had also been "couch surfing" until the month before the review hearing. And in the recent months leading up to the June 2022 review hearing, Mother attended only one visit in February, one visit in March, no visits in April, and one visit in May. Mother was employed but had not been working because she wanted to re-establish herself in services and visits with A.B. As the court noted below, Mother was getting involved in services "at the last minute." By the review hearing, however, A.B. was one-year-and-four-months old, and had not been in Mother's care since he was six months old.

When making a custody determination, the juvenile court's focus and primary consideration is the best interests of the child. (*In re Nicholas H.*, *supra*, 112 Cal.App.4th at p. 268.) Based on the totality of the circumstances here, including Mother's failure to make progress in her services, her inconsistency in her visitation, and her last minute efforts to re-establish herself in services, we conclude that it was not arbitrary, capricious, or patently absurd for the juvenile court to conclude that it was not in A.B.'s best interests for Mother to "share the right and the responsibility to make the decisions relating to [his] health, education, and welfare . . . ." (Fam. Code, § 3003 [defining "joint legal custody"].)

Mother argues this case is factually distinguishable from *In re Jennifer R.* (1993) 14 Cal.App.4th 704 (*In re Jennifer R.*) and *In re M.R.* (2017) 7 Cal.App.5th 886 (*In re M.R.*), where the Court of Appeal affirmed the juvenile court's decision to deny joint legal custody to the appellant mother. (*In re Jennifer R.*, *supra*, at p. 706; *In re M.R.*, *supra*, at p. 902.) For example, Mother argues she did not threaten to "take" her child if necessary and she did not have serious mental health issues or disabilities like the mother in *In re Jennifer R.* Similarly, Mother argues she was not a drug addict and did not abandon her child like the mother in *In re M.R.* Regardless, the circumstances of *this* case supports the juvenile court's determination that it would not be in A.B.'s best interest for Mother to have joint legal custody of A.B.

Because we conclude the court was within its discretion to grant full legal custody to Father, we do not reach Mother's prejudice argument.

## DISPOSITION

The judgment is affirmed.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

DO, J.