Filed 8/5/21  In re O.A. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re O.A.., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>T.D.,<br><br>        Defendant and Appellant. | A161891<br><br>(Alameda County Super. Ct. Nos. SJ11018124; SJ11018125) |

14-year-old O.A. and 12-year-old S.A. have been dependents of the juvenile court since 2012.  Their maternal great aunt and uncle have had legal guardianship of both children since 2015.  In 2021, after years of largely failed attempts to foster visitation with the children's mother, the juvenile court ordered that the legal guardianship continue and terminated dependency jurisdiction.  Mother appeals.

This family's case does not present exceptional circumstances warranting ongoing court supervision, so we affirm the order terminating the

dependency. However, the record also shows the juvenile court was unaware of its authority to issue a post-termination visitation order. We therefore reverse in limited part and remand for the court to determine under Welfare & Institutions Code section 366.26, subdivision (c)(4)(C)[1] whether visitation would be detrimental to the children. Unless the court so finds by a preponderance of the evidence, it shall order visitation with Mother as appropriate under the circumstances at that time.

## BACKGROUND

### *Detention and Jurisdiction*

These proceedings originated in 2011 due to concerns about parental substance abuse and neglect. O.A. was five years old and S.A. was three. Mother's and Father's parental rights as to an older daughter had been terminated three years earlier due to their history of substance abuse and the child had been adopted.

O.A. and S.A. were detained in a foster home in late 2011. Mother was granted supervised therapeutic visitation every other week, but she arrived at the first visit under the influence, failed to meet with the social worker or cooperate with her therapist, and missed the second scheduled visit.[2] When the parents did visit, the children would usually act out for several days afterward.

As of June 2012, Mother was consistently testing positive for cocaine, marijuana and alcohol. That month the children were placed with their maternal great aunt and great uncle (Aunt and Uncle, or guardians). The

---

[1]     Further statutory citations are to the Welfare and Institutions Code. References to rules are to the California Rules of Court.

[2]     Father is not a party to this appeal, so we will not address his involvement unless it bears directly on Mother's arguments.

2

juvenile court sustained allegations of failure to protect under section 300, subdivision (b), including that Mother was using cocaine, marijuana, methadone and alcohol; the children were unbathed, unkempt and hungry; Mother bit another woman in her drug program on the breasts and finger; Mother threatened suicide and was diagnosed with Psychotic Disorder, NOS; the children had been exposed to domestic violence; O.A. was not regularly attending school; and Mother had refused to allow a social worker into her home. Additionally, the court sustained a sibling abuse allegation under section 300, subdivision (j) related to the previous termination of parental rights.

The children were declared dependents of the juvenile court. The court bypassed reunification services pursuant to section 361.5, subdivisions (b)(10), (b)(11), and (b)(13) and ordered the Agency to arrange for visitation "as frequently as possible [consistent] w/the children's well-being." A section 366.26 hearing was set for October 2012.

Both children exhibited extremely troubling behaviors when first placed with Aunt and Uncle. O.A. struggled with managing his emotions, especially anger, and frequently lashed out at S.A., the guardians, classmates, and the family dog, sometimes damaging property during his bouts of rage. S.A. was frequently defiant and oppositional to the adults in her life and would slap, bite and hit her classmates with toys. She had tremendous difficulty with enuresis and encopresis, openly defecating on her bed in the middle of the day or at school, and repeatedly awoke screaming and crying from nightmares.

O.A. and S.A. regularly used foul language and engaged in sexually explicit behavior with each other and other children. O.A. made comments about wanting to kill Father and Uncle. Both siblings demonstrated

3

significant academic delays and a multitude of behavioral problems at school. They did not want to see their parents.

Aunt and Uncle were committed to a permanent relationship with the children but had reservations about becoming their legal guardians. Accordingly, the Agency recommended a "planned permanent living arrangement" as the permanent plan. (§ 366.26, subd. (c)(1)(A).) At a December 2012 hearing the juvenile court adopted the Agency's recommendation, selected a permanent plan of placement with Aunt and Uncle and ordered visitation to occur as frequently as possible consistent with the children's well-being.

Over the following years the children did well in their placement. Aunt and Uncle were committed to providing the support they needed. Although they had much more healing ahead, their behaviors slowly improved and they referred to Aunt and Uncle as their "mom" and "dad."

Visitation with Mother was less encouraging. As described in more detail below, Mother at first had only sporadic contact with the children and later entirely failed to visit them for long stretches of time despite repeated efforts by the guardians, the Agency and service providers to involve her.

Mother's first visit after the December 2012 hearing occurred in April 2013, when the children saw her at a family event they attended with Aunt. By all reports the visit went well, and Mother told the social worker she wanted to start therapeutic supervised visitation "as soon as possible." After several attempts by the social worker to contact Mother, the first supervised visit took place in September 2013. That visit went well: the children were happy to see Mother and she behaved appropriately. However, after that visit Mother repeatedly failed to show up for the scheduled twice-monthly visits, leaving the children sad, upset, and confused, despite the social

4

worker's efforts to encourage and facilitate her participation. Both children wanted to see their parents and the Agency continued to support visitation "under the caveat that the parents are mindful about the impact their failure to appear for visits has on their children, and that they would agree to abide by the policy . . . set regarding confirming visits by 5pm the day before the visit."

In June 2013 Mother gave birth to another son. Her participation in the scheduled visits remained sporadic despite the Agency's attempts to assist her, and in March 2014 she told the social worker she was too busy caring for the new baby to visit O.A. and S.A. The agency that supervised Mother's visits terminated its services that spring due to her lack of compliance and failure to respond to multiple calls, letters and text messages. Similarly, after some initial progress in her drug testing program and negative tests for substances other than marijuana and prescribed methadone, by October 2013 Mother was refusing to test and the tests were terminated in early 2014.

Meanwhile, O.A. and S.A. were making "incredible progress." Aunt and Uncle were working closely with their schools and therapists to address their behavioral and emotional challenges. After initial struggles, the children had become attached to their guardians and the relationship had deepened and strengthened. The social worker reported that "they feel safe and loved and their continued progress is evidence of the profound change that can come when a child is given the opportunity to experience permanency and continued stability in their life."

### Aunt and Uncle Are Appointed Legal Guardians

By August 2014 Aunt and Uncle had decided they wanted to become the children's legal guardians. The social worker continued her attempts to

contact Mother about visitation but was usually unable to reach her and, when she did get through, Mother would say she was "busy" or "unavailable" to talk. After several continuances, in April 2015 the juvenile court appointed Aunt and Uncle as the children's legal guardians and ordered monthly visits with Mother.

Mother's pattern of missed visits and minimal telephone contact with the children continued. By the fall of 2015 the children had not seen her in at least two years. The social worker reported for a September 2015 status review hearing that the last time she was able to reach Mother on the phone, Mother cut the conversation off without speaking to the children because "she was watching a movie."

Not long after that Mother disappeared from view. The Agency's attempts to contact her by phone, mail, and in person were unavailing, as were searches of various databases and state and federal prison locators.

Around the same time, by September 2015, Aunt and Uncle decided they wanted to adopt the children. The Agency changed its recommended permanent plan from long term guardianship to adoption. It explained: "After more than four years as Court dependents, the primary issue is the needs of the children, not the parents or the legal guardians. [O.A. and S.A.] need the stability and security of knowing that they have a permanent home with the great-aunt and great-uncle, and both children have strongly stated that they wish to be adopted. Adoption is in their best interests." The social worker noted that both children "have significant behavioral challenges, which the caregivers are addressing with appropriate services. The children have been placed with maternal relatives for nearly four years, and the relatives became their legal guardians one year ago. [Mother] has had very little contact with the children since their removal, and has not visited at all

6

in the last two years. The caregivers, Agency, and service providers made repeated attempts to involve her, but even phone contact has been infrequent."

Over the following months the Agency continued to recommend that parental rights be terminated to free the children for adoption. Mother and Father opposed the recommendation,[3] and a hearing on it was continued for a mediation regarding parental contact and visitation. In June 2016 the parents, guardians, social worker and children's attorney reached a mediated agreement that Mother would have weekly phone calls with the children on Saturday mornings and would visit them in August.[4] From late June through October Mother called occasionally, roughly every other week, although not always at the agreed-upon time.

In April 2017 the Agency again changed its recommendation. This time, because Father had begun visiting the children regularly and to ensure that services remained available to them, it asked that the court maintain the existing legal guardianship without terminating parental rights. The caretakers preferred adoption but did not oppose the new recommendation. Mother had not visited. Aunt had tried to set up a visit, but Mother said she was unsure if her car was reliable enough to get from Oakland to the Sacramento area where the guardians and children lived. When the children tried to call her in September 2017 they were unable to reach her.

In October 2017 the court adopted the Agency's recommendation that the legal guardianship remain in place.

---

[3] It is not clear exactly when Mother reestablished contact with the Agency.

[4] It appears that this visit did not take place.

7

*Mother Resumes Visitation*

In November 2017, Mother visited the children for the first time in five years. She said that although she had communicated with Aunt "every so often," Aunt would "never schedule and follow through with a visit." According to the social worker's report, Aunt "acknowledge[d] this to a degree." Following that first resumed visit Mother saw the children twice more, in December 2017 and again in March 2018, but she missed visits scheduled for January and February.

O.A. seemed to enjoy seeing Mother, although he was not interested in speaking with her on the phone. During this period his attitude and behavior improved. On the other hand, S.A. was conflicted about Mother's reappearance in her life. She enjoyed the visits but wanted to see Mother only on alternate months, and she soiled herself after Mother missed the January visit. The social worker believed S.A. required ongoing therapy to address the renewal of her relationship with Mother. Both children said they loved their parents and wanted them to continue visiting.

During Mother's March 2018 visit, she told the children that Father was not their "real father." O.A.'s behavior worsened after that incident and S.A. missed two subsequent visits with Father because of its emotional impact. Mother missed her next visit and refused to acknowledge the inappropriateness of her comment about Father, maintaining that she had to be "honest."

By September 2018 Mother had not visited the children in six months. After the visit the preceding March she started asking to have visits closer to her home in Oakland, rather than near the guardian's home. The social worker repeatedly explained that this was not possible. In August Mother asked for visits in the Sacramento area. The social worker said she would

speak with the guardians about whether and how to proceed; they were "taking it month by month to see if and when" S.A. would be ready to reconnect with Mother. Mother also requested that the children be immediately returned to her care because she had obtained stable housing and had been sober for "multiple years." She said that Aunt was not letting her have contact with the children and, if they could not be returned, she wanted them to be moved to a different relative placement.

By the end of 2018 both children no longer wanted visits with either parent. In November, in response to a request from Mother for visitation, the social worker arranged a second mediation with Mother, the guardians and the children's attorney. The outcome was an agreement that the children would inform the social worker when they wanted to resume visits and the Agency would then arrange for therapeutic visits at its office or a visitation center. Until then, though, both the children and the caregivers felt visitation would be emotionally detrimental to the children.

### Mother Seeks to Modify the Monthly Visitation Order

In February 2019 Mother filed a modification petition under section 388, asking the court to modify the existing visitation order to specify that monthly visits be reinstated; that if they occurred without issue, Mother would have unsupervised overnight visits; and that if those visits took place without issue, the guardianship would be terminated and the children returned to Mother's care.

In response, the Agency agreed that Mother should have monthly visits and informed the court that the parties had agreed in mediation that the social worker and guardians would consult the children's therapist for "insight regarding a clinically appropriate and responsible approach" to discussing renewed contact with Mother and how to best support them if

9

their behavior deteriorated as a result. The parties had further agreed that any initial visit would be supervised and that Mother would contact the social worker and guardians before giving the children any new information about their family history. The Agency was concerned because the children did not want to see Mother, while Mother wanted visitation and eventually to have the children returned to her care.

In June 2019 the court granted Mother's section 388 petition in part to allow monthly therapeutic visits "consistent with the minors' emotional well-being." In all other respects the petition was denied.

Six months later there had been no visits because the children still did not want contact with Mother and refused to see her. Eventually, however, their attitudes softened. O.A. became interested in scheduled calls or virtual meetings with Mother and S.A. was willing to write her letters and cards. In February 2020 the social worker suggested that Mother write to the children and offered to help them process their feelings about her letter. Mother did so, and the social worker gave each child a copy of the letter and read it aloud with them. Later O.A. had a "pleasant interaction" with Mother on the phone, but S.A. said she was not ready to speak with her. The social worker explained that Mother wrote the letter to express her love and encouragement and gave S.A. Mother's phone number and email address for "once she's ready."

Mother reached out to the Agency again in April 2020, during the statewide shelter-in-place. The social worker encouraged the children to contact her by phone or through a virtual meeting, but when O.A. called the number Mother had provided it had been discontinued. Over the next two months the social worker's attempts to contact Mother about visits and other communication with the children were unsuccessful for the same reason.

***December 2020 CFT Meeting***

Mother next approached the social worker about restoring communication with the children around December 2020. A Child and Family Team (CFT) meeting was held on December 8. The children agreed to have bi-weekly phone calls or virtual visits with Mother and Mother asked to attend any further CFT and monthly provider meetings "so that she can continue to support the minors and [Aunt]." The guardians were open to Mother establishing a healthy relationship with the children through recurrent virtual meetings and calls, although Aunt requested that such communications be scheduled and consistent to avoid emotional harm to S.A. and O.A. As of a January 2021 status report, Mother said she had been waiting the whole reporting period to have more frequent contact with the children and wanted weekly contact or more rather than the bi-weekly calls agreed upon at the CFT meeting.

***The Agency Recommends Terminating the Dependency***

Also in the January 2021 status review report, the Agency recommended that the juvenile court continue the legal guardianship and dismiss the dependency. The children were stable in their placement and funding to assist with their special needs was in place or available, so the social worker planned to meet with the guardians to discuss and prepare for dismissing the dependency.

At a status review hearing held on January 19, 2021, the Agency explained that the guardianship had been in place since 2012, much longer than the six-month presumptive maximum period for relative guardians, in part due to issues concerning the availability of services for the children. That was no longer an issue, and "[t]he children's best interest in this case does seem to be in dismissal because the strife between the family members

11

and continuing to argue about whether they will be forced to visit or not, where their allegiances lie, if their guardians are currently not getting along with the mother, that's not a juvenile court basis for jurisdiction."

The guardians also supported dismissal. Counsel for the children agreed and observed that Mother could maintain visitation by reaching out to Aunt "to smooth things over." In contrast, Mother wanted the court to maintain jurisdiction and schedule another mediation to ensure she could continue to visit the children. Alternatively, Mother asked that the court order the previously agreed-upon calls and virtual meetings to continue if it dismissed the dependency.

### *The Court Terminates Dependency*

The court reiterated its view that the children should not be forced to see Mother and should visit only if it was consistent with their emotional well-being. "They have for quite some time or at least for significant periods of time were resistant to visits—[which] caused anxiety and behavioral issues. They have lingering fears of mom, I think, from their experience with her in the past and as recently as the beginning of 2020, they were refusing visits. They would agree to phone contact only. [¶] They're secure and safe and happy in their placement. There is no need for an ongoing dependency matter. They're with their legal guardian. They're seeing mom at a pace that is appropriate for them and their desires."

The court found that, while visitation needs can constitute an exceptional circumstance requiring the retention of dependency jurisdiction, no such circumstances were present in this case. It continued: "The Court did fashion a visitation order. There were discussions as recently as December about how that ongoing contact would happen. It is my hope that the legal guardian[s] will honor that agreement. You know, when we dismiss to legal

12

guardianship, there are no custody orders.  There's no express written orders regarding visits.  I can fashion one orally here, but it would, I think, just cease to exist once the Court terminates jurisdiction.  But it's been my desire throughout this case that the children have contact with mom at a pace that they're comfortable with, given all of the trauma that they've endured.  I think that's best.  That's been the posture so far and that's what I intend to have continue."  The court found dismissal was in the children's best interest and accordingly dismissed the dependency.[5]

This appeal is timely.

## DISCUSSION

### I.

### *The Order Terminating Dependency Jurisdiction*

Mother contends the juvenile court abused its discretion in dismissing the dependency.  It did not.

When a juvenile court orders a permanent plan of legal guardianship and the guardianship has been established, it generally may elect to retain or terminate its dependency jurisdiction over the child.  (§ 366.3, subds. (a)(1), (a)(3).)  However, if a relative is appointed as the legal guardian and the child has been placed with the guardian in an approved home for at least six months, the court *must* terminate its dependency jurisdiction and retain jurisdiction over the child as a ward of the guardianship unless the guardian objects or the court finds that exceptional circumstances require it to retain dependency jurisdiction.  (§ 366.3, subd. (a)(3); rule 5.740(a)(4).)  Section

_____

[5]    Although the court ordered the dependency "dismissed," no statute authorizes dismissal of dependency, only dismissal of the petition.  (Compare §§ 366.3 and 366.4 [authorizing court to terminate dependency] with § 390 [authorizing dismissal of petition].)  Despite its terminology, we understand the court's order as terminating the dependency.

13

366.3 does not define "exceptional circumstances," but "because a primary difference between dependency and guardianship jurisdiction is the extent of oversight, it stands to reason that exceptional circumstances exist where the circumstances of the parties create a heightened need for judicial oversight." (*In re Ethan J.* (2015) 236 Cal.App.4th 654, 660 (*Ethan J.*).)

We review a decision to terminate dependency jurisdiction for abuse of discretion and will not disturb it unless it was arbitrary, capricious, or patently absurd. (*Ethan J., supra*, 236 Cal.App.4th at p. 660; *In re M.R.* (2017) 7 Cal.App.5th 886, 902.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' [Citations.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

Here, Mother asserts the court exceeded the bounds of reason in finding issues surrounding visitation did not present an exceptional circumstance warranting continued dependency jurisdiction. Specifically, she attributes the impediments to her visitation over the long duration of the dependency to resistance by the guardians, who she says believed it was of no benefit and "did virtually nothing" to ensure it occurred. The trial court reasonably viewed the record differently. While there was plainly friction between Mother and the guardians, as Mother observes, the history discussed above establishes that the problems with visitation were at least primarily caused by her own repeated failures to participate in scheduled visits, respond to the Agency's attempts to facilitate visits and calls, and provide the Agency with valid contact information, and by her own problematic behavior.

Evidence Mother cites as supporting her contrary view affirms this conclusion. Rather than demonstrating the guardians' purported resistance,

14

the status reports she points to document Aunt's attempts to encourage visits, the Agency's efforts to facilitate them, and Mother's record of failing to participate in them or communicate appropriately with the social worker and guardians. It is true, as she asserts, that by late 2019 Aunt opposed forcing visitation on reluctant children who demonstrated anxiety and behavioral problems at the mere suggestion of seeing their mother. Moreover, Aunt at one point late in the dependency did "acknowledge[] . . . to a degree" some failure to follow through when Mother "every so often" contacted her about visiting the children. But that does not compel the conclusion that the guardians discouraged or prevented visitation when it was compatible with the children's emotional well-being, or that they will fail to support visitation when it is in their best interests. To the contrary, the guardians have generally been receptive to visitation and other contact except when, due to Mother's behavior, it appeared likely to cause the children harm.

Mother's more specific claim that the lack of visitation "in more recent times" was "directly attributable to the behavior of the legal guardians" is similarly unpersuasive. Mother relies upon (1) the Agency's report in 2016 that *Father believed* it was the guardians, not the children, who were resistant to visitation; (2) its report in 2017 that, although visits with *Father* appeared to have been beneficial, *Father's* strained relationship with the guardians was "difficult"; and (3) Mother's own professed belief that Aunt failed to schedule and follow through with visits. Again, none of this compels the conclusion that the guardians will not act reasonably and support visitation when it is consistent with the children's' well-being.

*Ethan J.*, *supra*, 236 Cal.App.4th at p. 661, does not counsel otherwise. The minor there so consistently and adamantly refused to visit his mother that termination of dependency jurisdiction "virtually guaranteed that

15

visitation would not occur." (*Ibid.*)  That is not the case here.  The guardians have long supported contact except when they reasonably determined it would be contrary to the children's best interests.  Moreover, for much of the dependency period the children were open to visits, calls or other communications with Mother.  On this record there was no reason to conclude they would not, as the court intended, continue to "have contact with mom at a pace that they're comfortable with, given all of the trauma that they've endured."  It was well within the court's discretion to reject Mother's view that a need to enforce visitation presented an exceptional circumstance mandating continued jurisdiction.

## II.

### *Visitation*

Mother next argues that the court erred when it declined to issue a visitation order upon terminating jurisdiction.  This argument rests on sounder footing.

Section 366.26, subdivisions (c)(4)(A) and (c)(4)(C) direct that when children are placed in a legal guardianship "[t]he court shall also make an order for visitation with the parents . . . unless the court finds by a preponderance of the evidence that visitation would be detrimental to the physical or emotional well-being of the child."

The Agency does not dispute that here, absent a finding of detriment, section 366.26, subdivision (c)(4)(C) required the court to issue a visitation order upon terminating its dependency jurisdiction.  Rather, it suggests the absence of such a finding is of no consequence because substantial evidence supports the court's "decision" not to issue a visitation order.

The problem with this position is that the court made no such "decision."  As it stated from the bench, the court mistakenly believed that

16

any visitation order it made would simply "cease to exist" upon the termination of dependency jurisdiction. When a court orders legal guardianship and terminates dependency jurisdiction it ceases to hold ongoing review hearings, but it retains jurisdiction over the guardianship itself. Thus, the children, as wards of the court, remain subject to relevant provisions of the Welfare and Institutions Code; and the parent retains access to the juvenile court through a section 388 petition for modification of the court's orders.[6] (§ 366.4, subd. (a); see *In re Grace C.* (2010) 190 Cal.App.4th 1470, 1474 [juvenile court dismissed dependency and made a pre-existing visitation order the permanent order of the court; held, order did not improperly delegate authority over visitation]; *In re Twighla T.* (1992) 4 Cal.App.4th 799, 806 [parent could seek recourse through court's jurisdiction over the guardianship if problems with visitation arose after termination of dependency].) Under this legal framework, it is not surprising that neither party endorses the court's view that it had no authority to issue a visitation order upon terminating the dependency.

The Agency, however, seems to suggest the error is harmless because the prior visitation order remains in effect after the dependency terminated. We disagree. The supposition is unsupported by the record or citation to legal authority, and it was plainly not the juvenile court's understanding or

---

[6]     Different provisions apply when a parent retains or regains custody of the dependent child. In that situation section 362.4 authorizes the juvenile court to terminate its jurisdiction and issue exit orders as to custody, visitation or protective orders, which become part of any family court proceeding between the child's parents for paternity, nullity, dissolution or legal separation. (§ 362.4; *In re Kenneth S., Jr.* (2008) 169 Cal.App.4th 1353, 1358.)

17

intention that its earlier order would remain in place after it terminated dependency jurisdiction.

The Agency also urges that the court's failure to rule on visitation was harmless because there is no reasonable probability it would have ordered visitation had it understood its authority to do so. We disagree. While there have been many instances of poor compliance with services, failed visitation and orders ignored over the years, more recently Mother has demonstrated a renewed interest in pursuing contact with her children and, as of the final report and review hearing, neither they nor their guardians were monolithically opposed to some sort of future interaction. In any event, the juvenile court at the termination hearing openly expressed its "desire . . . that the children have contact with mom at a pace that they're comfortable with." Accordingly, we cannot conclude that any error was harmless, and return the matter to the juvenile court to conduct a new hearing on this sole issue and exercise its discretion under section 366.26, subdivision (c)(4)(C).

## DISPOSITION

The order terminating dependency jurisdiction is affirmed. The case is remanded to the juvenile court to address visitation pursuant to section 366.26, subdivision (c)(4)(C).

_____
Chou, J.*

WE CONCUR:


_____
Petrou, Acting P.J.


_____
Jackson, J.


A161891

---

*Judge of the Superior Court of San Mateo County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19