Filed 6/24/22  In re Savanah H. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re SAVANAH H. et al., Persons Coming Under the Juvenile Court Law. | B316015 (Los Angeles County Super. Ct. No. DK05739A–B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>K.B.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Craig S. Barnes, Judge.  Conditionally reversed with directions.

Maryann M. Goode, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

———————————————————

## I.  INTRODUCTION

K.B., mother of now nine-year-old Savanah H. and now six-year-old Emma M., appeals from the juvenile court's order terminating her parental rights pursuant to Welfare and Institutions Code section 366.26.[1]  Mother claims the court and the Los Angeles County Department of Children and Family Services (Department) failed to comply with their duties under the federal Indian Child Welfare Act (ICWA) and related state statutes and court rules.  We conditionally reverse and remand for the limited purpose of ensuring compliance with ICWA's requirements.

---

[1]  All statutory references are to the Welfare and Institutions Code.

## II. BACKGROUND[2]

On July 11, 2014, the Department filed an amended section 300 petition that alleged, as later amended and sustained, that father M.M.[3] physically abused then two-year-old Savanah and threatened to kill her, and mother failed to protect the child from father's abuse. The petition further alleged mother and father had a history of engaging in violent altercations in Savanah's presence—all of the identified conduct concerned father's domestic abuse of mother—and mother failed to protect the child from the domestic abuse. Finally, the petition alleged that father had a history of mental and emotional problems that rendered him incapable of providing Savanah with regular care and supervision and mother knew of father's condition but failed to protect the child.

The Department's May 27, 2014, Detention Report stated, "The Indian Child Welfare Act does not apply per . . . mother . . . on 05/09/14." Mother had "mild retardation with complications of a brain disorder."

Maternal stepgrandmother C.B. told a social worker that mother had special needs and had always been placed outside of her parents' home. Maternal great-grandparents raised mother and had a guardianship over her to help her with her special

---

[2]     Because the sole issue mother raises on appeal concerns the juvenile court's and the Department's compliance with ICWA and related state statutes and court rules, we limit our recitation of facts to those relevant to that compliance issue except as is necessary for context.

[3]     Father is not a party to this appeal.

3

needs. When mother reach the age of majority, maternal great-grandparents obtained a conservatorship over her. After maternal great-grandparents died, maternal great-aunt A.B. assumed the role of mother's conservator.

According to maternal stepgrandmother, maternal grandmother E.K. lived in another state and had mental health issues—"'she is crazy.'" Mother had several brothers and sisters, "but none of them have contact with her."

On June 13, 2014, mother filed a Parental Notification of Indian Status form stating she might have Indian ancestry. She wrote, "Tribe unknown, on my birth-mother's side. I do not have her contact number. She told me we have 'Indian in me'."

At a hearing on June 13, 2014, mother's counsel stated that mother knew someone who "might be able to get in touch with [maternal grandmother]." The juvenile court ordered the Department to investigate mother's claimed Indian ancestry and ordered mother to continue to provide the Department with information to enable it to conduct an appropriate ICWA investigation.

The same day, father filed a Parental Notification of Indian Status form stating he had no Indian ancestry as far as he knew. The juvenile court found ICWA did not apply as to father.

The Department's June 13, 2014, Jurisdiction/Disposition Report stated that ICWA did not apply. It reported that "[o]n 06/04/2014, [a dependency investigator] inquired with . . . mother as to any American Indian [h]eritage. [M]other denied American Indian heritage."

On June 21, 2014, the dependency investigator contacted maternal stepgrandmother in her effort to speak with maternal grandfather R.B. about the family's Indian ancestry. Maternal

grandfather was not home. Maternal stepgrandmother stated that maternal grandfather was German and English and had no "'Indian blood from his mom or dad's side of the family.'"

Maternal stepgrandmother was unsure, but believed maternal grandmother's family did not have Indian ancestry. Maternal stepgrandmother reported that she had Indian ancestry and suggested that mother might have gotten confused because she considered maternal stepgrandmother to be a mother figure. Maternal stepgrandmother was not a blood relation to mother or Savannah.

On June 21, 2014, the dependency investigator contacted maternal great-aunt A.B. to inquire about mother or Samantha's Indian ancestry. Maternal great-aunt stated that she could "confirm with certainty that there [was] 'no blood line of American Indian on either side of [mother's] family.'"

At the July 10, 2014, jurisdiction hearing, the juvenile court found it did not have a reason to know that Savanah was an Indian child. It ordered mother and father to keep the Department and their attorneys aware of any new information relating to possible ICWA status.

The Department's September 15, 2015, Status Review Report stated that mother and father "continued to deny any American Indian [h]eritage."

On June 13, 2016, the Department filed a section 300 petition on behalf of three-week-old Emma that alleged, as later amended and sustained,[4] that mother and father had a history of domestic disputes and physical altercations in Savanah's presence; father had struck mother, inflicting injuries; and mother demonstrated an inability to protect Savanah.

---

[4]     Mother and father pleaded no contest to the petition.

The Department's June 10, 2016, Detention Report stated that during interviews on May 19, 2016, mother and father denied having American Indian ancestry.

On June 13, 2016, mother and father filed Parental Notification of Indian Status forms stating that they did not have Indian ancestry as far as they knew. At the June 13, 2016, detention hearing, the juvenile court found ICWA did not apply.

On August 10, 2016, mother and father informed the dependency investigator in Emma's case that they did not have American Indian ancestry.

On August 31, 2016, father filed a Parental Notification of Indian Status form with respect to Savanah and Emma stating that he might have Indian ancestry. Father wrote, "Cherokee, my cousin [B.C.] just informed me . . . it is through my mother who is deceased." Father provided B.C.'s telephone number.

In its August 31, 2016, Jurisdiction/Disposition Report, the Department stated that maternal grandmother and maternal grandfather separated when mother was a baby. Maternal grandfather married maternal stepgrandmother when mother was three years old. Maternal grandmother remarried and currently resided in Arkansas. Mother had eight half siblings, seven of whom were alive. Mother stated she had a distant relationship with maternal grandmother and her half siblings. She had not spoken to maternal grandmother since 2012 or 2013.

Father reported paternal grandfather cheated on paternal grandmother multiple times and, as a result, father had 11 half siblings. Father did not have a relationship with his half siblings and did not know their names.

In its August 31, 2016, minute order, the juvenile court noted that father was "claiming possible Native American

6

heritage." (Emphasis omitted.) It found that it had no reason to know that "the child [Emma]" fell under ICWA. (Emphasis omitted.) It ordered the Department to investigate father's claim and provide the court with a report on its investigation that included the persons interviewed and dates and places of birth of relatives as far back as could be ascertained. The court would then determine whether that information triggered notice requirements.

In its October 27, 2016, Addendum Report in response to the juvenile court's order that it further investigate father's claimed Indian ancestry, the Department reported that father told a dependency investigator on September 7, 2016, "'I don't have any information to give you. My cousin told me that I was 1/2 German, 1/2 Italian, and 65% Cherokee.'" Father did not know if his Cherokee ancestry was his father's or mother's side.

Father told the dependency investigator that because paternal grandmother passed away in December 2015 and paternal grandfather passed away in 1993, he was unable to obtain any further information. Father said he recently came into contact with his cousin B.C. who said he had Cherokee ancestry. Father provided B.C.'s telephone number to the Department. Father did not have contact information for any other relatives.

The same day, the dependency investigator spoke with B.C. B.C. stated that his mother, S.J., and father's mother were sisters. S.J. was born in 1959—B.C. did not know the exact date. He believed she was born in Fontana, California. B.C. had not had contact with S.J. in about 12 years and did not know her contact information or whereabouts. B.C. was unsure if his family had Indian ancestry, but had been told his mother was

Cherokee, Irish, and Italian. He did not know if his family was registered with the Cherokee tribe. B.C. provided the names of his deceased maternal grandparents. He did not know their dates of birth. He was not close to his family and did not have contact information for any other relatives.

The dependency investigator asked father if he had S.J.'s contact information. He did not, but said he would notify the investigator if he obtained further information.

On June 5, 2017, the Department filed a section 342 petition that alleged, as later amended and sustained, that father physically abused Savanah and mother and father had an unresolved history of engaging in physical altercations. At the November 1, 2017, adjudication and review hearing, the juvenile court set the matter for a section 366.26 permanency planning hearing on February 28, 2018, as to Savanah and Emma.

In its February 13, 2018, section 366.26 report, the Department reviewed the ICWA information previously presented to the juvenile court. As to father's claimed Indian ancestry, it stated, "[F]ather was unable to provide concrete information regarding his American Indian heritage. Thus, no additional notices were required by the [c]ourt."

At the February 28, 2018, section 366.26 hearing, the juvenile court noted that the information concerning father's claimed Indian ancestry was "pretty vague," but "in [an] abundance of caution," it ordered the Department to send ICWA notices to the Cherokee tribes, the Bureau of Indian Affairs, and the Secretary of the Interior concerning father's claimed Indian ancestry. The Department was to submit all notices, return receipts, and any responses to the court. The court continued the matter to May 30, 2018.

On May 2, 2018, the juvenile court ordered all counsel to "to investigate any previous ICWA findings in this matter."

At the May 30, 2018, section 366.26 hearing, the juvenile court continued the matter to September 24, 2018, because the Department had not yet sent the ICWA notices.

In a Last Minute Information for the Court for a hearing on September 24, 2018, the Department reported that it mailed ICWA notices to mother, father, and the Eastern Band of Cherokee Indians on May 24, 2018. The Eastern Band of Cherokee Indians responded that neither Savanah nor Emma was registered or eligible to register as a member of the tribe.

The same day, the Department mailed ICWA notices to the United Keetoowah Band of Cherokee Indians, the Cherokee Nation, the Secretary of the Interior, and the Bureau of Indian Affairs. The Department received signed proofs of service for each of these notices, but no responses as to Savanah's or Emma's ICWA eligibility or possible registration.

The Department's ICWA notices are not contained in the juvenile court's file.

On September 7, 2018, a social worker sent e-mails to the United Keetoowah Band of Cherokee Indians and the Cherokee Nation following up on the Department's earlier IWCA notices. The Department did not receive responses to the e-mails and concluded that it was "probable that neither child is ICWA eligible" as more than 90 days had passed since the tribes received the ICWA notices.

At the September 24, 2018, section 366.26 hearing, the juvenile court found that ICWA notice was proper and that ICWA did not apply with respect to either child.

9

At the August 28, 2019, permanency planning review hearing, mother's counsel stated that maternal grandmother, who lived in Arkansas, expressed a desire to have Samantha and Emma placed with her and asked that maternal grandmother be assessed for placement.

On October 15, 2021, the juvenile court terminated mother's and father's parental rights to Savanah and Emma.

## III. DISCUSSION

### A. *Inquiry Duties Under ICWA*

"Pursuant to ICWA, '[i]n any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking . . . termination of parental rights to[ ] an Indian child shall notify the parent or Indian custodian and the Indian child's tribe' of the pending proceedings and its right to intervene. (25 U.S.C. § 1912(a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 8 . . . (*Isaiah W.*).) 'As the Supreme Court recently explained, notice to Indian tribes is central to effectuating ICWA's purpose, enabling a tribe to determine whether the child involved in a dependency proceeding is an Indian child and, if so, whether to intervene in or exercise jurisdiction over the matter. (*Isaiah W., supra*, 1 Cal.5th at pp. 8[–]9.)' (*In re Michael V.* (2016) 3 Cal.App.5th 225, 232 . . . .)

"'ICWA defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); see § 224.1, subd. (a).) The trial court and

[Department] have an affirmative and continuing duty in every dependency proceeding to determine whether ICWA applies. (§ 224.2, subd. (a); Cal. Rules of Court, rule 5.481(a);[fn. omitted.] *Isaiah W., supra*, 1 Cal.5th at pp. 10–11.)  In cases "where the court knows or has reason to know that an Indian child is involved," ICWA requires the [Department], or other party seeking adoption or foster care placement, to notify "the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention."  (25 U.S.C. § 1912(a); see *Isaiah W., supra*, [1 Cal.5th] at p. 5.)

"'Following changes to the federal regulations concerning ICWA compliance, California made conforming amendments to its statutory scheme regarding ICWA, effective in 2019.  (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048 . . . (*D.S.*).)  In *D.S.*, the court explained that the resulting clarification of law, found in part in section 224.2, "creates three distinct duties regarding ICWA in dependency proceedings.  First, from the [Department]'s initial contact with a minor and his family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child.  (§ 224.2, subds. (a), (b).)  Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the [Department] 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.'  (*Id.*, subd. (e), italics added.)  Third, if that further inquiry results in a reason to know the child is an Indian child, then the formal notice requirements of section 224.3 apply.  [Citations.]"  (*D.S., supra*, [46 Cal.App.5th] at p. 1052.)

"'At the first step, "[s]ection 224.2, subdivision (b) specifies that once a child is placed into the temporary custody of a county

11

welfare department, such as the [Department], the duty to inquire 'includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child.'" (*D.S., supra*, 46 Cal.App.5th at pp. 1048–1049.)' (*In re Charles W.* (2021) 66 Cal.App.5th 483, 489 . . . (*Charles W.*).)

"We review claims of inadequate inquiry into a child's Indian ancestry for substantial evidence. (*In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430 . . . (*Rebecca R.*).)" (*In re H.V.* (2022) 75 Cal.App.5th 433, 436–438.)

B. *Analysis*

1. ICWA Compliance As to Mother's Family

Mother contends the juvenile court and the Department failed to comply with their initial ICWA inquiry duties as to her family because the Department failed to interview maternal grandfather, maternal grandmother, and her siblings.

In its investigation of the children's possible Indian ancestry, the Department spoke with mother, great aunt A.B., and maternal stepgrandmother. It did not speak with maternal grandmother—the source of mother's claimed Indian ancestry— even though mother's counsel indicated at the August 28, 2019, permanency planning review hearing that she or mother had maternal grandmother's contact information;[5] maternal

---

[5] Although the August 28, 2019, revelation that mother's counsel or mother apparently had maternal grandmother's contact information occurred over five years after mother first

12

grandfather—although it spoke to maternal stepgrandmother who reported that maternal grandfather was of Irish and German ancestry and did not have any Indian ancestry—or any of mother's siblings.  The Department's first-step inquiry ICWA duty under state law was broader, requiring it to interview at least maternal grandmother.[6]  (§ 224.2, subd. (b); *Charles W., supra*, 66 Cal.App.5th at p. 489; *D.S., supra*, 46 Cal.App.5th at pp. 1048–1049.)

### 2. ICWA Compliance As to Father's Family

As mother largely concedes, the Department satisfied its duty of further inquiry by interviewing father and B.C. and attempting to obtain from them contact information for other paternal relatives and by sending notices and emails to the Cherokee tribes and notices to the Bureau of Indian Affairs. (§ 224.2, subd. (e).)  Mother's apparent complaint concerning the Department's further inquiry is the same complaint she makes concerning her claim that the Department did not satisfy ICWA's

---

identified maternal grandmother as the source of her claimed Indian ancestry, "[j]uvenile courts and child protective agencies have "'an affirmative and continuing duty to inquire whether a [dependent] child . . . is or may be an Indian child.'"  [Citations.]" (*In re M.R.* (2017) 7 Cal.App.5th 886, 904.)

[6]    There is no suggestion in the record that maternal grandfather or any of mother's half siblings has any information concerning mother's ICWA claim.  Accordingly, on remand, the Department's IWCA inquiry is not required to include maternal grandfather or mother's half siblings.

13

formal notice requirements—the Department did not file copies of the notices in the juvenile court.

Although section 224.3, subdivision (c) requires a child welfare agency to file copies of ICWA notices sent and return receipts and responses received when there is a *reason to know* a child is an Indian child, there is no similar provision when there is a *reason to believe* a child is an Indian child. (*D.S., supra*, 46 Cal.App.5th at p. 1049 ["The sharing of information with tribes at [the further] inquiry stage is distinct from formal ICWA notice, which requires a 'reason to know'—rather than a 'reason to believe'—that the child is an Indian child . . . [fn. omitted]"].) Accordingly, when a child welfare agency complies with its duty of further inquiry and learns of no new information that gives it a "reason to know"[7] a child is an Indian child, the juvenile court

---

[7] "(d)    There is reason to know a child involved in a proceeding is an Indian child under any of the following circumstances:

"(1)    A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child.

"(2)    The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village.

"(3)    Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child.

"(4)    The child who is the subject of the proceeding gives the court reason to know that the child is an Indian child.

"(5)    The court is informed that the child is or has been a ward of a tribal court.

14

properly may rule that ICWA does not apply. (*In re D.F.* (2020) 55 Cal.App.5th 558, 570–571 (*D.F.*); § 224.2, subd. (i)(2) ["If the court makes a finding that proper and adequate further inquiry and due diligence as required in this section have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings . . ."].) Here, when the Department satisfied its duty of further inquiry and obtained no new information establishing a reason to know the children are Indian children by virtue of father's claimed Indian ancestry, the court did not err in ruling that ICWA did not apply (*D.F., supra*, 55 Cal.App.5th at pp. 570–571; § 224.2, subd. (i)(2)) and the Department was not obligated either to send ICWA notices or to file those notices in the juvenile court (§ 224.3, subds. (a) & (c); *In re Jeremiah G.* (2009) 172 Cal.App.4th 1514, 1520 ["'if there is insufficient reason to believe a child is an Indian child, notice need not be given'"]).

---

"(6) The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe." (§ 224.2, subd. (d).)

## IV.   DISPOSITION

The order terminating mother's parental rights is conditionally reversed.  The case is remanded to the juvenile court to order the Department to interview maternal grandmother—to the extent she is still available—about the possibility of Indian ancestry through mother and to report on the results of the Department's investigation.  Based on the information presented, if the juvenile court determines that no additional inquiry or notice to tribes is necessary, the order terminating mother's parental rights is to be reinstated.  If additional inquiry or notice is warranted, the court shall make orders consistent with ensuring compliance with ICWA and related California law.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

I concur:

RUBIN, P. J.

16

In re Savanah H.
B316015


BAKER, J., Dissenting



Today's decision is a particularly stark example of how our Indian Child Welfare Act (ICWA) jurisprudence continues to be in disarray. (See, e.g., *In re Dezi C.* (June 14, 2022, B317935) ___ Cal.App.5th ___ [2022 WL 2128670]; *In re Q.M.* (May 18, 2022, B313171) ___ Cal.App.5th ___ [2022 WL 2168367, at *6]; *In re H.V.* (2022) 75 Cal.App.5th 433, 441 (dis. opn. of Baker, J.).) The dependency proceedings that generated this appeal have been pending now for over eight years, and yet the majority decides we must prolong these proceedings—and the overdue finality to which Savanah and her adoptive family are entitled—even further. Specifically, the majority holds there is no substantial evidence the juvenile court oversaw an adequate inquiry to determine whether Savanah is an Indian child.

That is a gross misapplication of the undisputed standard of review. (See, e.g., *In re J.N.* (2021) 62 Cal.App.5th 767, 774 ["'[W]e do not consider whether there is evidence from which the dependency court could have drawn a different conclusion but whether there is substantial evidence to support the conclusion that the court did draw'"].) The record reveals the juvenile court was well aware of its ICWA obligations and conscientious in its approach to discharging them. The court ordered appropriate investigation and notice by the parties, and the Department

interviewed several maternal family members about ICWA issues—all of whom reported no Indian heritage. That is more than adequate to affirm the parental rights termination order under the governing standard of review, and that is what we should do.

Lurking behind the majority's misapplication of the standard of review, however, is a more fundamental statutory interpretation question. The majority reverses and remands because it believes Welfare and Institutions Code section 224.2 (section 224.2) compels a leave-no-stone-unturned approach to ICWA inquiry. That, however, has undesirable and often absurd practical implications (see, e.g., *In re H.V., supra*, 75 Cal.App.5th at 441–442 (dis. opn. of Baker, J.)), and I do not believe the statute must be read that way. Rather, examination of section 224.2, subdivisions (b) and (e) (including the repeated "including but not limited to" formulations) along with section 224.2's focus on whether there is *sufficient evidence* an appropriate inquiry was undertaken (§ 224.2, subd. (i)(2)) reveals the inquiry described in those subdivisions is sensibly read as a list of categorical examples to guide juvenile courts charged with managing an adequate inquiry, not a long (and, indeed, theoretically never-ending) to-do list that (ultimately futile) attempts must be made to exhaust.[1]

---

[1]      This understanding of the pertinent statutory provisions is reinforced when considering the purpose of the statute as defined by the federal authority it is ostensibly intended to implement. (25 U.S.C. § 1903(4); 25 C.F.R. § 23.107; 80 Fed. Reg. 14880 (Mar. 20, 2015) [proposed rule]; 81 Fed. Reg. 38778 (June 14, 2016) [final rule].)

2

Sooner or later (and hopefully sooner), our Supreme Court is going to have to step in and bring some much needed clarity and predictability to this area of the law.


BAKER, J.