Filed 7/31/25  In re J.L. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| In re J.L. et al., Persons Coming Under the Juvenile Court Law. | C102690 |
| PLACER COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> S.K., <br><br> Defendant and Appellant. | (Super. Ct. Nos. 53005634, 53005635) |

The Placer County Department of Health and Human Services (Department) detained minors C.L. and J.L. from mother S.K.'s care under Welfare and Institutions Code[1] section 300 after J.L. was admitted to the hospital with symptoms of a drug

---

[1]     Undesignated section references are to the Welfare and Institutions Code.

1

overdose.  The juvenile court eventually found the allegations true and ordered the minors removed.  On appeal mother challenges the juvenile court's disposition order, jurisdiction order, visitation orders, and compliance with the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.).  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On August 28, 2024,[2] the Department filed a section 300 petition alleging C.L. (then age 5) and J.L. (then age 3) had suffered, or there was a substantial risk they would suffer, serious physical harm or illness as a result of the failure of their parents to "supervise or protect the child[ren] adequately" and by the inability of their parents to provide regular care for the children due to the parent's "mental illness, developmental disability, or drug use."  (See § 300, subd. (b)(1).)  The petition specifically alleged J.L. was hospitalized on July 10 with signs of an overdose from an unknown substance and was moderately responsive with a low heart rate.  It was later determined J.L. had ingested a prescription drug.  Mother also appeared "tired, unresponsive, and to be under the influence of substances."  J.L. was later "taken out of the hospital against medical advice by . . . mother's boyfriend, and the Department was unable to contact or locate . . . mother and [the] minors for over a month."  On July 15, several items were found in the bedroom of mother and the minors, including a scale, a clean hypodermic needle, small baggies, a small canister with a powdery white substance in it, and several prescription medications accessible to the children.  The petition also alleged C.L. was at a substantial risk of abuse or neglect based on the allegations involving J.L.  (§ 300, subd. (j).)  The minors were eventually detained and placed in foster care on August 26.

The detention report dated August 29 further explained mother and the children lived in a bedroom at mother's boyfriend's grandfather's house.  A social worker and law

---

[2]    All further dates are from the year 2024 unless otherwise noted.

enforcement officer searched the bedroom on July 15 and found the items listed in the petition. The officer believed the substance in the canister could be Fentanyl, but law enforcement officials were "ultimately not able to test the substance." Family members told the social worker they thought mother used illegal substances and they feared for the children's safety. Mother also had several previous contacts with the Department based on allegations the children were outside without adult supervision.

At the August 30 detention hearing, the juvenile court ordered the minors detained and ordered visitation for mother two times a week, giving the Department discretion to increase visitation and permit video calls. The court also ordered hair follicle testing of the children because the court was "concerned about the substance that was found within reach of the children that the officer deemed was possibly [F]entanyl."

The Department filed a jurisdiction and disposition report on September 20 requesting the juvenile court "sustain the allegations in the petition, the minors be detained from . . . mother . . . , and that [C.L.] and [J.L.] be declared dependents." The Department also recommended mother be provided reunification services and requested discretion for visitation. The report explained mother had discovered J.L. around 2:00 or 2:30 a.m. on July 10 but brought him to the hospital about 50 minutes later because she waited for a ride instead of calling emergency medical services. A hair follicle test was done on both children on September 11 and the tests came back "positive for methamphetamine[s] and amphetamines." The Department had also made numerous attempts to discuss the petition's allegations with mother in September but mother told the Department all communication must go through her retained counsel; the Department had not received any communication from mother's counsel. Mother then declined visits with the children on September 13 and September 17. Mother also had not engaged in any services at the time of the report. The report concluded: "[Mother] has made no progress towards alleviating or mitigating the concerns that brought [C.L.] and [J.L.] into the care and safety of [the Department]."

3

The juvenile court held a jurisdiction and disposition hearing on October 2. Mother's counsel noted at this hearing: "I'm told by my client and -- that she hasn't visited the kids in 30 days. [¶] Now, I know going through the report there's reasons why the Department says that may have not happened, and I'm not asking here to argue today about that -- about reunification services and visitation. I'm just asking that a schedule be set because she hasn't been able to see the children in quite some time." Mother's counsel also requested a contested jurisdiction and disposition hearing.

The contested jurisdiction and disposition hearing was held on November 8. Mother called social worker Sharah Gauthier, who testified she wrote the jurisdiction and disposition report. Gauthier was concerned about mother's supervision regardless of the cause for J.L.'s emergency visit because of the minors' positive test for methamphetamines. Even though the test occurred after the children were placed in a resource home, that home had "very strict guidelines," "there was no concern for substance use" at the resource home, and "the hair test goes back 90 days, which is a more thorough evaluation of substance exposure" than urine testing. When mother's counsel asked whether mother is a danger to her children, Gauthier responded: "At this point it's unclear to assess, as she has not been cooperating with the Department in order for us to even communicate with her to go over any of the concerns." Gauthier further explained the Department has concerns about mother's substance use, even if the concerns are not explicit in the petition's allegations because "[i]t was noted that there was concern for potential prior history, and that the boyfriend that she was residing with in the home of a potential relative also had a history. And based on the children's hair tests there was obvious exposure." Family members also reported concerns to Gauthier about mother's substance use and ability to care for the children. Thus, Gauthier ultimately had concerns about the minors' safety in mother's care.

The juvenile court sustained the allegations in the petition and ordered removal. For jurisdiction, the court found the allegations true based on "a lot of red flags": Mother

4

did not call 911 when she found J.L. in an altered state at 2:30 in the morning, apparently unsupervised, and did not arrive at the hospital until about 50 minutes later; the "history of allegations of failure to supervise"; family concerns of mother's substance abuse and hospital reports that mother may have been under the influence at the time of J.L.'s admittance; "drug paraphernalia was located in the house accessible to the children"; and "highly relevant" was the "evidence . . . the children test[ed] positive for meth[amphetamines] by hair follicle test after detention."

For disposition, the juvenile court found "mother failed to protect her children regarding access to dangerous substances, failed to properly supervise her children over several months, and when her child was critically ill she didn't call 911." The court also relied on "family members and friends hav[ing] reported concerns about substance abuse and lack of supervision for the children." The juvenile court found, "[T]he evidence is overwhelming, beyond clear and convincing, that return to [m]other at this time would . . . cause a substantial detriment to the children." The juvenile court also found, "[T]he Department has made reasonable efforts to prevent or eliminate the need for removal. And this is where [m]other's choice not to participate or cooperate with the Department works to [her] extreme disadvantage, because [the Department has] offered services and [m]other has rejected any contact." The court ordered reunifications services for mother and visitations twice a week with the discretion for the Department to approve unsupervised visits.

Mother appeals.

DISCUSSION

Mother challenges the juvenile court's: (1) jurisdiction order sustaining the petition; (2) removal order; (3) visitation orders and oversight; and (4) ICWA findings. We will address each argument in turn and conclude there was no reversible error.

5

## I

*The Juvenile Court's Jurisdiction Order Is Supported By Substantial Evidence*

Mother first challenges the juvenile court's jurisdiction order, arguing, "[T]he juvenile court erred [sustaining] the allegations that the children suffered or there was a substantial risk that the children will suffer abuse." We disagree.

In a dependency proceeding, a child welfare agency must prove by a preponderance of the evidence the minor who is the subject of a dependency petition comes within the juvenile court's jurisdiction. (§ 355, subd. (a); *In re I.J.* (2013) 56 Cal.4th 766, 773.) The juvenile court has jurisdiction to declare a child to be a dependent of the court pursuant to subdivision (b) of section 300 when the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following: [¶] (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child. [¶] . . . [¶] (D) The inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse." And for jurisdiction under subdivision (j) of section 300 when "[t]he child's sibling has been abused or neglected . . . and there is a substantial risk that the child will be abused or neglected."

We review a juvenile court's jurisdictional finding for substantial evidence, asking whether the record contains evidence that is reasonable, credible, and of solid value sufficient for a reasonable trier of fact to find jurisdiction. (*In re M.R.* (2017) 7 Cal.App.5th 886, 896.) We consider the record as a whole, resolving all conflicts and drawing all reasonable inferences in support of the juvenile court's findings. (*Ibid*.) We do not reweigh the evidence. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) If supported by substantial evidence, the finding must be upheld even though substantial evidence could also support a contrary judgment. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

We have no difficulty concluding substantial evidence supports the juvenile court finding the allegations true. As outlined by the court, there was evidence mother did not

act with urgency when she discovered J.L. severely ill, there were numerous prior allegations of inadequate supervision of the minors, family members were concerned about mother's drug use and her ability to care for the minors, items consistent with drug paraphernalia were found in the room where the minors slept, and the minors tested positive for methamphetamines. We agree with the juvenile court this last fact is highly relevant because mother either provided methamphetamines to her children or she left them unsupervised in an area where methamphetamines were available. Either scenario supports the minors are at substantial risk of suffering harm from mother's failure to adequately supervise.

Mother argues the minors did not test positive for methamphetamines until they were out of her custody. This is of no significance. As social worker Gauthier testified, "the hair [follicle] test goes back 90 days, which is a more thorough evaluation of substance exposure" than urine testing. Gauthier also had no concerns the minors could have been exposed at the resource home. There is therefore substantial evidence the minors were exposed to methamphetamines while in mother's care, supporting the juvenile court's jurisdiction finding.

II

*The Juvenile Court's Removal Order Is Supported By Substantial Evidence*

Mother next challenges the juvenile court ordering removal, arguing, "[T]he evidence available to the court did not support its conclusion that there was [clear and convincing evidence] that removal was the only way to protect the children from the risks associated with remaining in [mother's] custody." We disagree.

Before removing a child from parental custody, the juvenile court must find clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . .

7

physical custody." (§ 361, subd. (c)(1); see *id*., subd. (d); *In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.)  The juvenile court must also "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor" and "state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).)  "A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if [the minor] remains with the parent.  [Citation.]  The parent need not be dangerous and the minor need not have been harmed before removal is appropriate.  The focus of the statute is on averting harm to the child."  (*T.W.*, at p. 1163.)

"We review a dispositional order removing a child from a parent for substantial evidence, ' "keeping in mind that the [juvenile] court was required to make its order based on the higher standard of clear and convincing evidence." ' "  (*In re M.V.* (2022) 78 Cal.App.5th 944, 960.)  "[A]ppellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands," meaning "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true."  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996.)  "We view the record in the light most favorable to the prevailing party and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence."  (*M.V.*, at p. 960.)

There was substantial evidence supporting the heightened standard for removal. The juvenile court relied on similar evidence for disposition as it had for jurisdiction. This included failing to call 911, family reports of substance abuse, prior lack of supervision, and "mother fail[ing] to protect her children regarding access to dangerous substances."  There can be no question access to, and consumption of, methamphetamines is a substantial risk to the minors.  The circumstances surrounding

8

how the minors consumed methamphetamines are unknown because mother did not interact with the Department. But the minors testing positive for methamphetamines is powerful circumstantial evidence of both mother's inability to provide proper care for the minors and potential detriment to the minors if they remain with mother. We therefore conclude there was substantial evidence supporting the juvenile court's order removing the minors from mother's care.[3]

Mother makes the same arguments against the evidence minors tested positive for methamphetamines under her care here as she did for jurisdiction, and we reject these arguments for the same reasons as discussed above. Mother similarly argues, "[T]here was no evidence that [she] was using drugs." This is incorrect. There were multiple reports by family members mother was abusing drugs, staff at the hospital reported she looked like she was under the influence of substances when she brought J.L. in, and there were items consistent with drug use discovered in the room mother shared with the minors. Drug use does not automatically justify removal, but drug use that puts the minors in substantial risk of harm does. (*In re S.F.* (2023) 91 Cal.App.5th 696, 717-718.)

III

*Mother Fails To Establish Visitation Error*

Mother also challenges the juvenile court's orders and oversight of visitations, but here her arguments are facially insufficient. Mother asserts, "[The Department] failed to

---

**3**     Mother states in a heading of her brief there was no substantial evidence "removal was the only way to protect the children." This could imply a challenge based on reasonable alternatives to removal. (§ 361, subd. (d).) But mother does not offer any further argument or evidence on alternative reasonable means to removal or how reasonable efforts were not made to prevent or eliminate the need for removal of the minors. These issues therefore cannot be a basis for error. (*Carmichael v. Café Sevilla of Riverside, Inc.* (2025) 108 Cal.App.5th 292, 297 (*Carmichael*) ["We presume [the juvenile court's] ruling is correct, and [appellants] have the burden of showing error on appeal"].)

ensure the minors visited with their mother, as evidenced by arguments made at the hearing that she had not had any visits with her children in over thirty days." As the Department points out, counsel's arguments are not evidence. (*York v. City of Los Angeles* (2019) 33 Cal.App.5th 1178, 1191 ["Most of [the appellants]' citations are to the assertions of their attorneys, which are *argument*, not evidence"].) Further, mother's counsel never said the Department failed to ensure visits. Counsel noted there was a lack of visits but acknowledged there could have been explanations for it, stating, "I know going through the report there's reasons why the Department says [visits] may have not happened, and I'm not asking here to argue today about that -- about reunification services and visitation."

Mother similarly argues the juvenile court "acted as an advocate for [the Department]" by not returning the minors and its "lack of involvement when [the Department] refused to comply with the visitation orders, as they were required to do; and deliberately interfered with the reunification process." Mother presents no evidence the Department failed to provide visitation opportunities to mother or interfered with the reunification process, and it is mother's burden to establish error. (*Carmichael*, *supra*, 108 Cal.App.5th at p. 297 ["We presume [the juvenile court's] ruling is correct, and [appellants] have the burden of showing error on appeal"].) We consequently conclude mother has not established error related to the court's management of visitation.

IV

*Mother Has Not Established A Violation Of The ICWA*

Mother finally contends, "The [j]uvenile [c]ourt committed reversible error by not making a proper [ICWA] finding and substantial evidence does not support a finding the ICWA did not apply because [the] Department's noticing duty was triggered under section 224.2, subdivision (a), and the Department failed to notice the relevant tribes." (Italics omitted.) We disagree.

10

A

*Additional Background*

The petition stated the initial ICWA inquiry gave the social worker "reason to believe the child is or may be an Indian child" based on a potential familial relationship with the Cherokee tribe. When initially asked at the detention hearing whether there was any information regarding Indian heritage, mother said: "I was told . . . [on the minors'] biological father's side that they have some. I'm not sure what tribe it is, but" the minors had insurance through "Native American health services." Another family member at the hearing also thought the maternal grandfather may be associated with the Cherokee tribe.

On October 1, the social worker received a call from the ICWA director for Enterprise Rancheria Estom Yumeka Maidu Tribe (Maidu). This director said the paternal grandmother was an enrolled member of the Maidu tribe so the minors "are known Indian [c]hildren and if it was open enrollment for the [Maidu] [t]ribe, they would be enrolled." The Department received a formal letter from the Maidu tribe on October 2. The letter stated: "The [Maidu] [t]ribe['s] enrollment is currently closed, but the children would likely be eligible for enrollment with [the Maidu tribe] and do[] fall under the [ICWA]." The letter listed the minors' great-great-great-grandmother as the "[b]ase roll descendant." The minors' grandmother also had two children enrolled as members but minors' biological father, who died in 2021, was not listed as enrolled. The social worker called the director who clarified, "[T]he children are in fact eligible for [the] ICWA, not would likely be eligible, as the letter states. [The director] stated the [Maidu] [t]ribe was not going to intervene in the case, but expected [a]ctive [e]fforts to be given to this family."

The Department filed a report on October 30, which stated: "There is not a [t]ribe intervening at this time, however there is reason to know that the children may be eligible for membership in the [Maidu tribe]." The report also stated, "[A]ctive efforts are being

11

made to provide remedial services and rehabilitative programs that were designed to prevent the break-up of the Indian family."

At the November 8 hearing, social worker Elizabeth Rahm testified she called the Cherokee tribe and a representative said all ICWA inquiries must be submitted via formal letter, which Rahm sent in and was then waiting for a response. The juvenile court then found the ICWA did not apply because the minors' biological father was not a registered member of the Maidu tribe and this tribe "has stated that enrollment is currently closed." The court also noted the Department is continuing their inquiry into potential Cherokee ancestry.

B

*Legal Standards*

"As this court has explained: ' "The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for removal of Indian children from their families, and by permitting tribal participation in dependency proceedings. [Citations.] A major purpose of the ICWA is to protect 'Indian children who are members of or are eligible for membership in an Indian tribe.' [Citation.]" [Citation.] The ICWA defines an " 'Indian child' " as a child who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." [Citation.] The juvenile court and the social services [department] have an affirmative and continuing duty, beginning at initial contact, to inquire whether a child who is subject to the proceedings is, or may be, an Indian child.' " (*H.A. v. Superior Court* (2024) 101 Cal.App.5th 956, 960-961.)

" '[S]ection 224.2 creates three distinct duties regarding [the] ICWA in dependency proceedings. First, from the [Department]'s initial contact with a minor and [the minor's] family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial

12

inquiry creates a "reason to *believe*" the child is an Indian child, then the [Department] "shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable." (*Id*., subd. (e), italics added.) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply. (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone "knows or has reason to know that the child is an Indian child"]; *id*., subd. (d) [defining circumstances that establish a "reason to know" a child is an Indian child]; § 224.3 [ICWA notice is required if there is a "reason to know" a child is an Indian child as defined under § 224.2, subd. (d)].)' [Citation.] Additionally, the juvenile court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child.' (§ 224.2, subd. (c).)" (*H.A. v. Superior Court*, *supra*, 101 Cal.App.5th at p. 961.)

A juvenile court's finding that the ICWA does not apply is "subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).) Its "fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1141.)

C

*Mother Has Not Established A Violation Of The ICWA*

Mother makes one general assertion of ICWA error several times in her brief: Family members "informed [the Department] that the children had Native American heritage on both parents' sides. Additionally, [the Department] found that [the] ICWA applied in the underlying matter. Further, the . . . Maidu [t]ribe stated the children were likely eligible and fall under the [ICWA]. Although enrollment is closed, [the] ICWA should still apply as the children would otherwise be eligible." We discern three distinct arguments and conclude they are all baseless.

First, whether the Department was informed of possible Indian heritage is not itself any basis for error. Knowledge of possible Indian heritage triggers certain notice requirements for the Department. (See § 224.2, subds. (e), (g).) But mother does not provide any argument or evidence the Department did not satisfy these notice requirements for the two tribes involved in this case beyond simply saying "the Department failed to notice the relevant tribes." Both tribes certainly had notice of the proceedings involving the minors, so mother's lack of argument on how this notice is insufficient is fatal to her notice argument. (*Carmichael*, *supra*, 108 Cal.App.5th at p. 297 ["We presume [the juvenile court's] ruling is correct, and [appellants] have the burden of showing error on appeal"].)

Second, mother does not cite to anywhere in the record the Department found the ICWA applied. The Department initially stated there was reason to believe the minors were Indian children, and then after receiving the letter from the Maidu tribe stated, "[T]here is reason to know that the children may be eligible for membership in the" Maidu tribe. But we find no evidence in the record the Department concluded the minors are Indian children. Mother also does not present any analysis or legal support that a department's ICWA finding is binding on the juvenile court.

Third, and finally, mother argues the relationship to the Maidu tribe requires ICWA application. We disagree. The ICWA defines an " 'Indian child' " as a child who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); see § 224.1, subd. (b).) Mother's own arguments exhibit why the minors are not Indian children through the Maidu tribe. She states: "*Although* enrollment is closed, [the] ICWA should still apply as the children would *otherwise* be eligible." (Italics added.) We agree, had the tribe not closed enrollment and the minors were enrolled, they would be Indian children under the first prong of the definition. But the record establishes they were not enrolled before enrollment closed, foreclosing the first definitional prong for

14

being Indian children.  Further, the minor's biological father was not a member of the Maidu tribe before he died.  This necessarily forecloses the second definitional prong for being Indian children.  Thus, there is substantial evidence supporting the juvenile court's determination the minors are not Indian children through the Maidu tribe.

We therefore conclude mother did not establish error under the ICWA.

DISPOSITION

The juvenile court's orders are affirmed.


/s/
ROBIE, Acting P. J.


We concur:


/s/
DUARTE, J.


/s/
RENNER, J.